EMANUEL RAAB *vs.* THE STATE OF MARYLAND.

By the true construction of the acts of Assembly, defining the limits of Baltimore city, that city is *not an adjoining jurisdiction* to Anne Arundel county, and, therefore, under the present constitution and laws, a criminal case cannot be removed from the Criminal Court of Baltimore city to the Circuit Court of Anne Arundel county, for trial.

ERROR to the Circuit Court for Anne Arundel county.

The plaintiff in error was indicted in the Criminal Court of Baltimore city, for receiving stolen goods, (four yards of satin, of the value of eight dollars,) knowing them to have been stolen. After plea of *non cul.* upon his affidavit and suggestion, the court removed his case to the Circuit Court for Anne Arundel county, for trial, where he was tried and found guilty.

After verdict, the traverser moved in arrest of judgment, upon the ground that the Circuit Court for Anne Arundel county had no jurisdiction to try the case, it not being a court of a county adjoining the city of Baltimore, to which alone the judge of the Criminal Court was required by the constitution to remove the cause. This motion the court (BREWER, J.,) overruled, and sentenced the prisoner to confinement in the penitentiary for eight years. To correct this judgment the traverser sued out a writ of error from the equity side of said Circuit Court. The following is the opinion of the court below, delivered upon overruling the motion in arrest:

"A motion in arrest of judgment was made in this case, for want of jurisdiction in the court, which has been argued, and involves the question, 'Whether Anne Arundel county adjoins the city of Baltimore?'

"It seems to me that it is very convenient and desirable to bound both States and counties by streams of water; a stream being a natural, permanent and nearly unalterable boundary, especially a navigable stream, and that also seems to have been the object of the Legislature in dividing the State of Maryland; the Chesapeake bay and Susquehanna river dividing the Eastern and Western Shore, and nearly all the counties on the Eastern and Western Shore, certainly wherever it could be done, being divided by rivers. (I will hereafter refer to the particular acts.) Where the counties are divided by streams not navigable, in analogy to grants, each of the adjoining counties runs to the middle of the stream.

"The same rule may possibly obtain as to navigable rivers; of that, however, I doubt. It is indispensable, however, that some county should have *jurisdiction* over navigable water for some purposes, and to remove all doubt, if any existed, as to the bay, the act of 1809, ch. 138, secs. 19, 20, prescribed the jurisdiction as to offences committed on it. The act of 1704, ch. 92, recites, in its 3rd section, 'And whereas there are several counties that are divided by navigable rivers, and *no rule yet made* how far the jurisdiction of each county shall extend on the river, be it enacted, &c., that every county *lying on any navigable river* in this province, shall extend its jurisdiction from the shore to the channel of said river that divides the county, and *be divided* from the other county by the channel of the said river.'

"Before the passage of that act, by the act of 1695, ch. 13, the county of St. Mary's was laid off, including all that *land* lying between Patuxent and Potomac rivers, the division between it and Charles county being Bud and Indian creeks, and a line drawn from the head of one creek to the head of the other. St. Mary's is bounded by the *lower side of the creeks*.

"Charles county:—the bounds begin where the *upper bounds* of St. Mary's *end*, and extends itself upwards to Mattawoman creek and branch, (which is on the Potomac,) and is divided on the upper side from Prince George's by that creek and

Swanson's creek, which runs into the Patuxent river, and a straight line from the head of one creek to the head of the other.   Including *all the land* lying on *the upper part* of Bud and Indian creek branches, *where St. Mary's county ends,* to the *lower side* of Mattawoman and Swanson's creek and branch, between *Patuxent and Potomac rivers.*

"Prince George's county, includes the land from the *upper side* of Mattawoman and Swanson's creek, &c., *extending* upwards, and bounded by Patuxent on the east, and Potomac on the west.   *No limit* is fixed to the *upper* part of the county.

"Calvert county:—this county has always been understood to bind on the north-east side of Patuxent river.   It lies in its whole length between that river and the bay.   I can find no published law on the subject of its boundaries, except those relating to the divisional line between it and Anne Arundel, which do not mention other boundaries; but one of these, the act of 1823, ch. 183, terminates the divisional line *at the river* Patuxent, which sufficiently shows, I think, that it bounded on the north-east side of the river, and was divided *by the river* from St. Mary's, Charles, and part of Prince George's. I cannot find when it obtained the name of 'Calvert.'   It was the county formerly called Patuxent, the bounds of which are to be found in ch. 6 of 1654, recorded in the Council Chamber.   This act extends the county from the south side of Mr. Marshes' creek, extending down the bay, including all the families and land on the south side of these creeks, including all the cliffs, with the *north and south* side of Patuxent river, with all the creeks *thereunto belonging,* and shall be called *as it is,* Patuxent county.

"Patuxent river runs nearly north and south, the upper side of the river being east or north-east.   This act was passed more than forty years before the laying off of St. Mary's by the act of 1695.   The law would seem to give it a considerable extent below the Patuxent, and if its boundaries were to be determined by this law, and the law of 1695, it might include the river, which is contrary to the received opinion now.

Though the language of the law is peculiar and indefinite, giving no southern boundary, but including in the county the north and south *sides* of the river, with all the creeks, seeming to include the creeks in the county, but not the river.

"On the Eastern Shore, the Isle of Kent, by the same act of 1695, is added to and made part of Talbot county. That part of Talbot county lying on the *north side* of Corsica creek, *running* up the main eastern branch to the head thereof, shall be the southerly bounds of the county of Kent, and on the north by the county of Cecil.

"The act of 1704, ch. 92, recites in the *preamble* the laying off of counties by this act of 1695, and the act of 1698, ch. 13, relating to the division of Baltimore and Anne Arundel counties *only*, confirms them in its second section, and makes the provision before mentioned.

"The last act of 1698 begins Baltimore county on the *Chesapeake bay*, and extends it thence with certain lines to the Patuxent river, and up that river to its head, giving *no bounds* to the *upper part* of the county. All that *tract of land* lying on the north side of the said division lines, &c., to be in Baltimore county, and all the land, &c., on the south side thereof, to the *ancient* extent of Anne Arundel county, to be in Anne Arundel county.

"Then comes the act of 1704, reciting these acts, and establishing a rule as to the jurisdiction of counties binding on navigable rivers. This act, it is contended, applies only to the counties *mentioned in those* acts as binding on navigable waters, in which Anne Arundel and Baltimore counties are not included.

"I do not think it is thus confined. A part of the State only was, at that time, laid off into counties. It must have been then contemplated to lay off *other counties*. The bounds between Cecil and Kent, and the upper bounds of Cecil, were not accurately defined, nor the bounds of Talbot on every side, nor were the upper bounds of Baltimore and Prince George's. Some of the other counties *thereafter* to be laid off, might be bounded by navigable rivers, and the object of

the act of 1704, although it refers only to the counties already laid off, seems to be to *establish a rule* applicable to all *similar cases.* The language of the law in the enacting part of the clause is very general, 'that every county lying on any navigable river.' The Legislature is establishing *a rule* applicable to a *particular class* of cases, and why should not the rule apply to all subsequent additions to that class?

"The first we hear of Anne Arundel county, is in the act of 1650, ch. 8, which provides, 'That that part of the Province of Maryland *on the west side of the bay of Chesapeake, over against the Isle of Kent,* formerly called by the name of *Providence,* by the inhabitants there residing, shall from henceforth be erected into a shire or county, by the name of Anne Arundel county,' and by that name to be ever hereafter called.

"By the act of 1654, ch. 5, it is again called Providence, and so designated in ch. 17, of the same year.

"By the repealing and confirmatory law of 1676, ch. 2, the act of 1650 is confirmed. The act of 1654 is not, however, expressly repealed. At the period of 1750, I find no counties mentioned but St. Mary's, Anne Arundel, and Isle of Kent: no others appear to have been laid off at that time. Bacon says there were but two, St. Mary's and the Isle of Kent counties, *(page* 1649,) the only counties represented in the Legislature. Anne Arundel then included all the Western Shore on the north of the Patuxent, to the extreme bounds of the State, and Prince George's included all on the south side of the Patuxent. I see no mention made of Baltimore county, in the published laws, before the act of 1698.

"Next comes the act of 1726, ch. 1, entitled, 'An act for uniting part of Baltimore county to Anne Arundel county.' By this act 'the *land lying* on the south *side of Patapsco river,* and contained within the bounds following, viz., from the mouth of the said Patapsco river *with the said river* to the head thereof, &c., shall be, and forever hereafter deemed as part of Anne Arundel county,' and 'all that part of the act of 1698, ch. 13, for dividing Anne Arundel county, which relates to the *south side* of Patapsco river *being added* to Bal-

timore county, is repealed.' What were the bounds of Baltimore county when the act of 1698 was passed, cannot be found in the published laws. Many acts of Assembly were lost, and among them probably a law laying off Baltimore and other counties, for in 1715, a court was provided for Baltimore county. There must, therefore, have then been many inhabitants in the county.

"In 1637, the Assembly, the first on record, passed a law for the *dividing of the Province*, of which Bacon says there is no record to be found.

"In 1654, the Legislature was held at Patuxent, and Patuxent, by ch. 6, was erected into a county.

"Baltimore county, like Prince Georges, must have had inhabitants in 1698, and probably reputed, if not fixed boundaries. The act of 1698 *settled* the division line between it and Anne Arundel different, no doubt, from the former boundaries, for the act of 1726, ch. 1, speaks of the *land* on the south side of Patapsco *being added* to Baltimore county.

"This act, in addition to the last mentioned provision, bounds Anne Arundel county on the south side of the river, which, if the act of 1704 applies to counties subsequently laid off, carries it to the middle of the stream, and at any rate would leave to Baltimore county only half of the river, precisely the same as if a law bounded it on the north side.

"But what motive could influence the legislature to give to Baltimore county the whole of this navigable part of the river? By the former division it was necessarily in Baltimore county, as Severn, South river, &c., were in Anne Arundel, but as it was determined it should not extend south beyond the river, the intention of the Legislature to make *the river the boundary* is much more probable. The river was useful to both counties for the purposes of navigation, and the use of the shore to neither for any other purpose except that of a division line. I do not think any navigable river in the State will be found included in the body of the county, except where, by *other outlines*, it is necessarily embraced in it.

"Now let us look at the division of *other counties* subsequent to the act of 1704.

"Talbot county, by the act of 1706, ch. 3, contains '*all the land* on the *north* side of 'Great Choptank river' up to Tuckahoe bridge, across to Swetnam's mill, thence down the *south side* of Wye river to its mouth, showing the intention of the Legislature to make *the river the boundary* further by giving to Talbot, Bruff's island lying in Wye river.

"Queen Anne's county is laid off between Talbot and Kent counties, taking a *part of each* by the same act, and includes '*all the land* on the *south* side of Chester river to Small's Branch,' making the bay the starting point for this line. The islands in the bay are divided, Kent island being given to Queen Anne, and Sharp's, Choptank and Poplar island being given to Talbot. Then making the bay again the starting point, it is bounded on the south *with Talbot county* to Tuckahoe Bridge, in words therefore, so far including Wye river by the *south side* of which Talbot county is bounded. But this could not have been *the intention of the Legislature*, because that line would include 'Bruff's island,' which *by the same act* is given to Talbot.

"Kent county, by the same law, begins *on the bay* 'at the south point of Eastern neck,' (which is on the north side of Chester river;) thence up the bay 'to *Sassafras river*,' and up said river to the *south* end of long pine bridge, lying over the head of the said river, which shows the intention of bounding it on the *south side* of Sassafras river, thence with other lines till it intersects *the line* of Queen Anne's county, and '*with the said county* down Chester river to Eastern neck,' where it first began. Here also the words would at first seem to include in Kent county, the whole of Chester river, because it runs down Chester river with Queen Anne's county, which county is bounded by the south side of Chester river. But that *could not have* been the intention, because the line down the river ends at the *beginning on the north side* of the river. It is clear that the counties were *intended to join*, *the river* being the boundary between them.

"Then comes 'Cecil county,' which 'shall contain *all the land* on the north side of Sassafras river *and Kent county*,

bounded on the south with Sassafras river *and* Kent county, inconsistent expressions of it was intended to bind it *on the line* of Kent county, which is on the *south side* of Sassafras river. It is obvious that it was *intended to join* Kent county, but that the *river should be the* boundary line. On the west, Cecil is bounded 'with Susquehanna river and the Chesapeake bay.'

"Next comes 'Harford county:' by the act of 1773, ch. 6, this comprehends *'all that part of* Baltimore county which is included within the bounds following, to wit: 'Beginning at the mouth of the little falls of Gunpowder river, and running with said falls to the fountain head;' thence with other lines, including Spesutia and Pool's islands, to the mouth of Gunpowder river, thence up the said river to the beginning, as aforesaid. This is very similar to the case now to be decided. Harford county runs from the mouth of Gunpowder river *up the said river*, not with the *north side* of the river, but it runs to the 'mouth of the falls,' which is on the north side. No part of the river is included *in words* in Harford county, which would leave the whole of it in Baltimore county, yet is it not obviously the intention to make *the river* the boundary between the two counties? In the case of Harford, commencing at the mouth of the river, it runs to the falls, thence running with the unnavigable falls, the middle of the stream would be the boundary; with Anne Arundel the Patapsco is navigable but a short distance, then the *middle* of the stream is the boundary; would it not be absurd, in both cases, to run the line with the navigable part, *on one side*, then having arrived at the unnavigable part, to cross over and run *up the middle?* Harford is bounded on one side with Susquehanna river and Chesapeake bay, *no side* being mentioned—the same as with Cecil. The river is unquestionably the boundary between those two last mentioned counties.

"Somerset county.—I can find no law laying off this county originally; probably *there never was one.* The first notice I find of its boundaries is in the act of 1742, ch. 19, which prescribes its bounds *from that time.* It runs with the south-

ern boundary of the State, Pocomoke river, then across to Nanticoke river, thence down the said river with Dorchester county to the mouth thereof, thence including all the islands *formerly deemed* to be in Somerset county, to the beginning; all the remaining part of what is *now reputed* to be within the county of Somerset to constitute Worcester county, which is not divided from Somerset by a navigable stream.

"Caroline county, which is composed of parts of Dorchester and Queen Anne's county, by the act of 1773, ch. 10, runs one of its lines to the 'Nanticoke river;' thence with said river, *to and* with the exterior limits of the said county of Dorchester.

"Dorchester county.—I can find no act laying off this county, but a branch is made the division between it and Worcester county, which branch must run into the Nanticoke. '*The land on* the north side of the branch to be in Dorchester county, and all the lands to the southward thereof to be in Worcester county.' That part of Dorchester now making a part of Caroline, runs with the river Nanticoke and the exterior limits of the county of Dorchester. It is evident from this and the line of Somerset county on the Nanticoke, that the river is the boundary between the two counties.

"Thus we have all the counties on the Eastern Shore, except Worcester lying in the interior and not on a river, divided by navigable rivers, so Cecil and Harford, and Harford and Baltimore. What counties have jurisdiction on those rivers, or is there any jurisdiction if the act of 1704, *establishing a rule* in such cases, does not apply to them?

"Why should the line between Baltimore and Anne Arundel be different?

"Anne Arundel, I have shown, is bounded by the river, which would carry it to the middle of the stream, and there is a strong presumption that Baltimore, before the act of 1698, ran *to the river* only.

"This view, I think, is strengthened, rather than weakened, by the act of 1816, ch. 209, extending the limits of the city of Baltimore. The line runs with the southern extremity of

the Lazaretto lot to the Patapsco river; thence across the river to Whetstone point, on which the Fort is built, on the *main branch* of Patapsco river, 'and running with and bounding on the said main branch' to the place called the Ferry point, being the junction of the said main branch with the middle branch, and thence due west to the western side of the middle branch, and on the west by a line running from the termination of the last mentioned line on the Western Shore of the middle branch, and binding on the said shore, &c. These lines include *all* the land on the south side of the old city limits, which was in Baltimore county and was intended to do so. Running with the river, if the county ran with the river, it would certainly give to the city all the rights of the county connected with the land, which would carry the city to the middle of the river so far as it extended on it, which right is indispensable to the city. Adopting the other construction, that the city is confined to the shore and the whole river is still in the county, it would be of the greatest inconvenience to the city, and this the legislature understood. They include the whole of the middle branch, which is a much smaller and shorter stream in the city limit, while running to the shore of the main branch only; and by that, giving the command of the water to the middle of the river, which, as I have said, was indispensable to it.

"If it had been apprehended in the least that the whole of the main branch was in Baltimore county, they would have taken the precaution to run the line *across the main* as they did across the middle branch, or to have extended it into the middle of the stream, or have made some other effectual provision to give to the city a sufficient command of the adjoining water. This idea of Anne Arundel county holding the land on one side of the river and the city of Baltimore on the other, while Baltimore county held the middle of the stream, is neither a useful, practical, nor liberal construction of the acts of the Legislature. It is an afterthought of lawyers, astute in the discovery of technical points, and zealous in the behalf of their clients who are to be benefitted by them.

"Being satisfied that I am right in this point, which is important to be settled, I have not considered any other, although it may perhaps be made a question, whether an objection for want of jurisdiction can be taken in a removed case, by a motion in arrest of judgment, and whether it should not have been taken by motion to remand the cause."

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and MASON, J.

*William Pinkney Whyte* and *Reverdy Johnson* for the plaintiff in error, argued, that Anne Arundel county does not adjoin the city of Baltimore, and that the transmission of the proceedings in this case to that court, was not in accordance with the 28th section of the 4th article of the constitution, which is the only guide in such cases, *(State vs. Shillinger,* 6 *Md. Rep.*, 449,) and the judgment was therefore erroneous.

Baltimore county was formed in or about the year 1659, and its bounds were first described in a proclamation of the 6th of June 1674, by which its southern boundary was defined to be "the south side of Patapsco river, and from the highest plantations on *that side* of the river due south two miles into the woods." Subsequently the lines dividing Baltimore and Anne Arundel counties, were described by the act of 1698, ch. 13. This act gives to Baltimore county land lying south of Patapsco river, beginning at a point one and a quarter miles below Bodkin creek, and running the line westwardly, changing its direction slightly, to the Patuxent. This boundary remained unchanged till the act of 1726, ch. 1. By this act "the land lying on the south side of Patapsco river" was added to Anne Arundel county. The northern boundary of Anne Arundel county was, therefore, limited to the south side of Patapsco river, and the jurisdiction over the *entire river* remained in Baltimore county. This was the very point decided in *Handly's Lessee vs. Anthony*, 5 *Wheat.*, 374, in reference to the States of Kentucky and Ohio. It was there *held*, that where one State is the original proprietor, and grants the territory on

one side only, it retains the river within its own domain, and the newly erected State extends *to the river only, and the low-water-mark is its boundary.* See also 13 *How.*, 381, *Howard vs. Ingersoll.*

Baltimore city having been subsequently erected out of *a part of Baltimore county*, and having a separate and independent jurisdiction, (5 *Md. Rep.*, 375, *Wright vs. Hamner*,) it is necessary to see how *its* limits are defined. Baltimore town was located on the north side of Patapsco river, by the act of 1729, ch. 12. It was increased in size by the acts of 1732, ch. 14, and 1745, ch. 9, by the last of which Jones' town and Baltimore town were united. A great number of acts were subsequently passed, enlarging the limits of the town, but none affecting its southern boundary. It was incorporated as the city of Baltimore by the act of 1796, ch. 68. By the act of 1797, ch. 121, a court was established for the trial of criminals in that city. This court was afterwards abolished, and the old city court (which the present Criminal Court of Baltimore succeeded, const. art. 4, sec. 13,) established by the act of 1816, ch. 193. By the fifth section of this act the jurisdiction of this court is expressly limited to the limits and precincts of Baltimore, which limits are there correctly defined. The limits of the city, on its south side, are defined by the act of 1816, ch. 209, and on Poppleton's map, made under the authority given in the act of 1817, ch. 148. In the year 1816, Baltimore county extended across the Patapsco river, and Baltimore city was part of Baltimore county. By the act of that year, ch. 209, that *part of Baltimore county contained within the limits* specified in the act, was made *part of Baltimore city.* These limits do not extend *into the river;* the *act exhausts itself* when the lines reach *to the river.* It therefore follows, from the acts referred to, that the entire bed of the Patapsco river is under the jurisdiction of Baltimore county, and this jurisdiction *intervenes* between Baltimore city and Anne Arundel county, and the case is entirely unaffected by the act of 1704, ch. 92.

The argument *ab inconvenienti*, based upon the fact, that

this construction would make Baltimore county the *only adjoining* county to the city of Baltimore, and that, therefore, all criminal cases from the Criminal Court must be removed to that county, is not of greater force than in the cases of Worcester and Allegany counties, which confessedly have but *one* adjoining county. But provision was carefully made in the constitution, by which this inconvenience, if it should exist, might be remedied by the Legislature, by authorizing removals to be made to counties *not* adjoining, under the second *proviso* to the 28th sec. of art. 4, "that such further remedy in the premises may be provided by law, as the Legislature shall from time to time direct and enact."

The case of *State vs. Dashiell,* 6 *H. & J.,* 268, is an answer to the difficulty suggested in the concluding portion of the opinion of the court below, as to *the time when,* and the *mode* in which the objection to the jurisdiction may be made. It was there made by a motion in arrest of judgment, as in the present case.

*James S. Franklin,* State's Attorney for Anne Arundel county, for the State, said that he desired the question of jurisdiction to be settled, and therefore waived all objection to the mode in which it was presented by the record. He then argued that Anne Arundel county is an adjoining county to the city of Baltimore, and that the transmission of the proceedings in this case was, therefore, in accordance with the requirements of the 28th section of the 4th article of the constitution.

The act of 1650, ch. 8, erected Providence into a county by the name of Anne Arundel, and the act of 1698, ch. 13, defines the limits of Anne Arundel and Baltimore counties. The act of 1704, ch. 92, referring, in its preamble, to the act by which the bounds of St. Mary's, Charles, Prince George's and Kent counties were defined, as well as to that of 1698, ch. 13, dividing Baltimore and Anne Arundel counties, and reciting, that whereas "*no rule* has been made how far the jurisdiction of each county shall extend on the river," *enacts,*

"that every county *lying on* any navigable river, shall extend its jurisdiction from the *shore to the channel* of such river that divides the county, and be divided from the other county by the channel of the said river." This act is analogous to the common law doctrine of *ad filum medium aquæ*, between riparian proprietors, and establishes a natural and desirable *rule* which was to be *fixed* and apply to *future* as well as to existing counties. With full knowledge of this act, the act of 1726, ch. 1, was passed, which makes Anne Arundel county *lie upon* the Patapsco river. Then came the various laws incorporating Baltimore city, (which, for all the purposes of this argument, is to be regarded as a county, *Wright vs. Hamner*, 5 *Md. Rep.*, 375,) and these also were enacted with a full knowledge of the act of 1704. The act of 1816, ch. 209, clearly makes the southern limits of the city extend *to the Patapsco*, and therefore makes this river, as all others were, subject to the act of 1704, and thereby the limits of the city were extended to the *channel*, where they met those of Anne Arundel county. There must be a clear exception in the grant nullifying, *pro tanto*, the act of 1704, to render it inapplicable.

In the division of counties since the act of 1704, they are almost without exception divided by streams of water, and each runs *to* the river only. The jurisdiction over the Chesapeake bay is provided for by the act of 1809, ch. 138, secs. 19, 20. Unless, therefore, the act of 1704 was meant to, and does, apply to *future* as well as to *existing* cases, an offence committed on any of the rivers dividing such counties, to wit, Wye, Chester, Sassafras, Susquehanna, Gunpowder, Nanticoke, and Patuxent, all of which separate counties, could not be punished in *any court of this State.* The construction that this act was prospective in its operation, evidently governed the Legislature in laying off and defining the bounds of counties subsequent to its passage.

The argument, *ab inconvenienti*, shows that it was not intended that Baltimore county should retain the exclusive jurisdiction over the Patapsco. The contrary hypothesis would

Raab *vs.* The State.

make Baltimore county the *only one* adjoining the city, which is negatived by both the language and the spirit of the constitution. Baltimore city having the greater necessity for removals, the constitution intended to gratify it, and not to make comparatively a burlesque of the right, by confining the removal to *one county.* If Baltimore county had been, in the opinion of the convention, the only adjoining county, it would have been mentioned by name, and the right of removal specifically extended to others.

The cases cited from *Wheat. & Howard,* by the counsel on the other side, are not applicable to this, for there is a vast difference between a *sovereign State* ceding a *portion of its territory,* and a State dividing off its counties for the purpose of jurisdiction.

TUCK, J., delivered the opinion of this court.

We are to determine in this case whether Baltimore city and Anne Arundel county are adjoining jurisdictions.

By the act of 1698, ch. 13, Baltimore county embraced a considerable portion of what is now within the lines of Anne Arundel county; but by the act of 1726, ch. 1, it is declared, that "from and after the last day of May 1727, the land lying on the south side of Patapsco river, and contained within the bounds following, viz: From the mouth of the said Patapsco river, with the said river to the head thereof, and from thence bounding on the south side of the main falls, &c., &c., shall be, and forever hereafter deemed, as part of Anne Arundel county." It is manifest that the river, after this act, remained as it had been for many years, within the limits of Baltimore county, and that the jurisdiction of these counties adjoined on its southern shore, unless affected by the act of 1704, ch. 92, which provides, "that every county lying on any navigable river in this Province, shall extend its jurisdiction from the shore to the channel of such river that divides the county, and be divided from the other county by the channel of said river;" and, under this act, if applicable, the river, as far as the channel, remained in Baltimore county, and subject to the jurisdiction of its courts.

63      v.7

It is insisted on the part of the State, that because Baltimore city is a separate jurisdiction under the present constitution, the act of 1704, ch. 92, applies to it, and that by its terms and proper construction, it joins Anne Arundel county at the channel of the river. We are of opinion, that the present case does not depend on that act of Assembly, for the reasons about to be stated.

It is clear, that the act could have had no other effect than to enlarge the limits of Anne Arundel county to the channel, and that it did not extend the line of Baltimore county into the river. If it operated on these counties at all, its effect was to restrict the southern line of Baltimore county to the channel, and not to assign to it any jurisdiction not previously possessed. Before the act, this county had within its limits all the river, and afterwards, at least as far as the channel. In this state of things, the acts of 1816, chaps. 193 and 209, were passed: the former for the establishment of Baltimore city court and the latter to enlarge the bounds of Baltimore city. By chapter 209 it is provided, that the precincts of Baltimore city and all that part of Baltimore county which is included within certain metes and bounds, shall be annexed to, and made part of, the city. The southern and western limits—all that is material in this case—extend from the Lazeretto lot " to the most southern part of Whetstone point on the main branch of the Patapsco river, and running with and bounding on the said main branch, (excluding the fort,) to the place called the Ferry point, being the junction of the said main branch with the middle branch aforesaid, and thence due west to the western side of the middle branch aforesaid, and on the west by a line running from the termination of the last mentioned line, on the western shore of the middle branch, and binding on the said shore to the north of Gwynn's falls, thence up and with the south-west side of Gwynn's falls," &c., &c.

If, as contended on the part of the State, the effect of this application of the act is to give jurisdiction to the city, as far as the channel, over all that part of the river between it and Anne Arundel county, then, upon the same principle, that part of the middle branch which divides the city from Baltimore

county, must, as far as the channel, be under the jurisdiction of that county, because the county binds the southern and western shores of that branch, as Anne Arundel county does the south side of the main river opposite the city. The consequence of which construction would be to extend the city, on the river line, beyond the limits specified in the act, and to diminish its territory and jurisdiction as to the middle branch, though actually embraced by the act. The legislature, while professing to enlarge the city, surely did not mean to continue in the county the jurisdiction over any part of this area. On the contrary, it was the plain intent of the act to make the middle branch, and all other portions of the county taken within these limits, parts of the city, and subject to its authority, leaving to the county jurisdiction over all not thereby included.

This view is sustained by the act of 1816, ch. 193, by which the same limits were established as the sphere within which Baltimore city court, (to whose powers the criminal court succeeded,) should have jurisdiction; and the *sixth* section vests in the county court and its judges all the powers, jurisdiction and authority previously exercised by the court of Oyer and Terminer in and over all that part of Baltimore county which was not included in the city and precincts as therein described.

If, as we think upon consideration of these acts of Assembly, the jurisdiction of the city was confined to the limits prescribed, part of the river at least was left within that of Baltimore county, and if so, there is an intervening jurisdiction between the city and Anne Arundel county, from which it follows that the record of the present indictment was improvidently transmitted to the circuit court for that county.

The argument predicated upon the supposed inconvenience that may result from a reversal of this judgment cannot apply to the present case, inasmuch as the Patapsco river has always been within the jurisdiction of one or both of the counties bordering on its shores.

The counsel for the State, wishing to have the prominent point on the record decided, waived all objection to the form in which it is presented. As a precedent, however, for determin-

ing the question as properly arising on a motion in arrest of judgment, see *State vs. Dashiell,* 6 *H. & J.,* 268.

*Judgment reversed.*