110

## DEPARTMENT OF NATURAL RESOURCES *v.* ELDRIDGE R. FRANCE

[No. 1115, September Term, 1974.]

*Decided September 8, 1975.*

The cause was argued before ORTH, C. J., and MELVIN, J., and EDWARD F. BORGERDING, Administrative Judge of the District Court of Maryland for District 1, specially assigned.

*Warren K. Rich, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Henry R. Lord, Deputy Attorney General,* on the brief, for appellant.

No appearance for appellee.

MELVIN, J., delivered the opinion of the Court.

This appeal presents for determination the location of the jurisdictional water boundary between Wicomico County and Somerset County.

The issue was spawned in November, 1974, when enforcement officers of the Department of Natural Resources (Department) apprehended the appellee and others allegedly using patent tongs to catch oysters in the Wicomico River near its confluence with the Nanticoke

River. They were charged with violation of § 4-1011 (a) of the Natural Resources Article of the Maryland Code (1974 Ed.), which prohibits the use of patent tongs to catch oysters in the waters of five eastern shore counties, including Wicomico County; Somerset County waters are not included in the prohibition.

When the appellee was brought to trial in the District Court of Wicomico County, that court found that the alleged offense occurred within the jurisdictional boundaries of Somerset County and dismissed the charge for lack of venue.

On December 10, 1974, the appellee and others filed a bill of complaint against the Department in the Circuit Court for Somerset County alleging that despite the District Court's ruling, "the respondent's officers, upon the instruction of the respondent, have continued to wrongfully harass, hinder and interfere with the Complainants in their daily occupation by ordering them to cease their lawful tonging of oysters and have continued to arrest the Complainants and issue summons for them to appear in the District Court for Wicomico County, for alleged offenses, knowing the alleged offenses and act of the Complainants took place in Somerset County, Maryland, and that the District Court of Wicomico County will not hear the cases involving the alleged offenses because of lack of proper venue."

On December 13, 1974, the Department, the appellant here, filed in the Circuit Court for Wicomico County a bill of complaint for "Declaratory Judgment and Injunction by way of Ancillary Relief" seeking a declaration "that the proper and constitutional boundary between the waters of Wicomico County and Somerset County, *for purposes of Title 4 of the Natural Resources Article,* is that established by the Oyster Survey of 1906 to 1912, and its amendments" and an injunction "ordering the Respondents [including the appellee here] to cease and desist the taking of oysters by the use of patent tongs, in violation of § 4-1011 (a) of the Natural Resources Article, Annotated Code of Maryland, (1974 Volume, 1974 Supplement), from the waters of Wicomico County as defined by the Charts of the Oyster

Survey of 1906 to 1912, and its amendments." (Emphasis added)

On December 20, 1974, the appellee, alone, filed in the Wicomico County proceedings a cross-bill to the Department's bill of complaint. The appellee's cross-bill adopted by reference the allegations which the appellee and others had set forth in their bill of complaint filed December 10, 1974, in Somerset County. A copy of the Somerset County bill of complaint was filed with the cross-bill. In his prayer for relief the appellee asked the court to issue "an injunction Ordering and Directing the Cross-Respondent to cease and desist further interference with the Cross-Complainant's occupation and Ordering the Cross-Respondent to cease and desist issuing summons or other charging documents requiring the presence of the Cross-Complainant in the District Court for Wicomico County, Maryland, for offenses allegedly occurring within the territorial limits of Somerset County, Maryland, or the prosecution thereof in the District Court for Wicomico County, Maryland."

Neither side filed answers to the other's pleadings. The matter, nevertheless, came on for trial in Wicomico County before Judges Duer and Pollitt.

In their final order the trial judges gave each side substantially what they asked for. The order reads as follows:

"For the reasons dictated to the court stenographer in open court, it is this 23rd day of December, 1974,

ORDERED BY THE CIRCUIT COURT FOR WICOMICO COUNTY, MARYLAND:

(1) That the proper boundary between the waters of Wicomico County and Somerset County for the purposes of Title 4 of the Natural Resources Article of the Code is that established by the Oyster Survey of 1906 to 1912 and its amendments, and that the Respondent, Eldridge R. France, and all other

holders of licenses to take oysters for commercial purposes by the use of patent tongs, are hereby enjoined from the taking of oysters by the use of patent tongs in the waters of Wicomico County as shown [1] on the Oyster Survey of 1906 to 1912 and its amendments.

(2) The proper boundary between Wicomico County and Somerset County for the purposes of service of process is as shown on the county maps of Wicomico and Somerset Counties issued under authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, Chapter 129, and the Department of Natural Resources and its agents are hereby enjoined from instituting prosecution of any person in the District Court for Wicomico County, Maryland, for any offenses against the laws of this state alleged to have occurred within the territorial limits of Somerset County, Maryland, as shown on said maps.

The court costs herein are to be divided equally between the parties."

The Department has appealed from the second paragraph of the order. The appellee filed no appeal and no brief, so the first paragraph of the order is not before us for review.

The Department contends that the trial court erred in holding that the jurisdictional boundary line between the two counties is as shown on the county maps of Wicomico and Somerset Counties issued by the Geological Survey under authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, Chapter 129. Instead, it

---

1. The trial court thus held that for purposes of delineating oyster bars and prohibited areas of activity concerning the State's natural resources, boundary lines shown on the Oyster Survey of 1906 to 1912, and its amendments, are controlling. Section 4-1001 (a) and (d) of the Natural Resources Article provides that "In this subtitle [subtitle 10. Oysters and Clams] the following words have the following meanings indicated . . . . 'County waters' means the waters lying within the territorial limits of any county in the State as defined by the charts of the Oyster Survey of 1906 to 1912, and its amendments". The Oyster Survey, however, did not purport or have authority to affect the *jurisdictional* limits of the counties.

argues that the true line is the mid-channel line of the Wicomico River, using the word channel to mean the deepest part of the river. If the Department is correct, the appellee's alleged offenses took place within the jurisdictional boundaries of Wicomico County, for the evidence is clear that the deepest part of the river lies south of the place patent tongs were allegedly being used.[2] On the other hand, it is equally clear that the boundary line shown on the maps of the Geological Survey is north of the place where the alleged offenses took place, so that, if the trial court is correct, Somerset County is the proper venue. In other words, the alleged offenses occurred somewhere between the two disputed lines, the Geological Survey line being north of the deep channel line.

In support of its position the Department refers us to Article XIII, § 2, of the Constitution of Maryland which created Wicomico County in 1867. The limits of the county are there set forth, in part, as follows:

> "Beginning at the point where the Mason-Dixon's Line crosses the channel of Pocomoke River, thence following said line to the channel of the Nanticoke River, thence with the channel of said river to Tangier Sound, or the intersection of Nanticoke and Wicomico Rivers, *thence up the channel of the Wicomico River* to the mouth of Wicomico Creek . . . ." (Emphasis added).

The Department argues that "channel" means the "natural channel" and that the natural channel is the deepest part of the river, and that the boundary thus established is the true boundary between the counties for jurisdictional purposes and can only be changed by constitutional amendment.

We do not agree.

First of all, we do not agree that as used in the context of

---

2. At the place in question, Wicomico River runs generally east and west, with Somerset County to the south and Wicomico County to the north. The boundary line established by the charts of the Oyster Survey of 1906 to 1912, and its amendments, follows closely the deep-channel line.

Article XIII, § 2, the word "channel" necessarily denotes a fine line delineating the deepest part of the river. The word is defined in Black's Law Dictionary (Revised Fourth Edition) in various ways:

> "CHANNEL. The bed in which the main stream of a river flows, rather than the deep water of the stream as followed in navigation. But the term is sometimes used to designate the customary and traveled way. It may also be used as a generic term applicable to any water course, whether a river, creek, slough or canal. The 'channel' of a river is to be distinguished from a 'branch'. [Citations omitted].
>
> MAIN CHANNEL. That bed of the river over which the principal volume of water flows.
>
> The main channel of a navigable stream, called for as a boundary between states, means the 'thalweg' or deepest and most navigable channel as it then existed [Citation omitted].
>
> NATURAL CHANNEL. The channel of a stream as determined by the natural conformation of the country through which it flows. The floor or bed on which the water flows, and the banks on each side thereof as carved out by natural causes." [Citations omitted].

Webster's Third New International Dictionary (1967) gives the *primary* meaning of the word as "the hollow bed where a natural body or stream of water runs or may run". The secondary meaning given is "the deeper part of a moving body of water (as a river, harbor, or strait) where the main current flows or which affords the best passage."

It is undoubtedly true that the word "channel", when employed in treating of subjects connected with the navigation of rivers and bays, indicates the line of deep water which vessels usually (but not always) follow. In this sense it is frequently used by boatmen of the Chesapeake Bay and its rivers. As a precise boundary line between

counties, however, it is all but illusory and fosters uncertainty where certainty should exist. *See Dunleith & Dubuque Bridge Co. v. County of Dubuque,* 8 N. W. 443 (Iowa, 1881). At trial it was stipulated that an expert for the Department would, if called to testify, say that "a navigable channel may or may not always follow the natural channel". It is also true, as a matter of common knowledge, that many rivers have more than one "channel" frequently used by boatmen. In fact, the chart of the Nanticoke River (Plaintiffs' Exh. 9) shows two such "channels", one on each side of the river, with a large area of shallow water between them.

It seems to us more likely that the framers of the 1867 Constitution used the word channel in its primary sense as meaning the great body of water between the banks of the river, and that, by analogy to the common law rule pertaining to non-tidal stream boundaries, the intended boundary was a line running along the middle of the river. However, our decision as to the *present* boundary between the two counties need not depend on this interpretation, for in 1908, by Chapter 487 of the Laws of Maryland, the General Assembly passed the following law, now codified as Sections 82-84 of Article 75 of the Code (1975 Repl. Volume):

"AN ACT to define the jurisdiction of counties, and to supply maps showing the same to the officials of the counties of this State.

WHEREAS, Some doubt exists as to the jurisdiction of certain counties situated on the navigable waters of the State; therefore.

Section 1. Be it enacted by the General Assembly of Maryland, That the jurisdiction of every county bounded at any point by navigable waters shall extend from the shore to the inside of the channel, which shall be regarded to be the center of said waters, except where said waters adjoin neighboring States, in which case the jurisdiction of said counties shall continue to the ultimate limits of the State at the place in question; provided,

however, that nothing in this Act shall be construed as changing such rights as the State of Maryland may have on or under such waters.

Sec. 2. Be it further enacted, That the center of the waters aforesaid shall be deemed to be as represented on the county maps issued under authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, chapter 129, and said maps shall be admissible as evidence as to the location of the boundary or boundaries aforesaid.

Sec. 3. Be it further enacted, That certified copies of said county maps shall be filed with the clerks of the several courts for all the several counties of Maryland, and also with the Board of County Commissioners of said counties; said maps to be regarded as official and authoritative.

Sec. 4. Be it further enacted, That this Act shall take effect from the date of its passage."

The maps of Wicomico and Somerset Counties promulgated pursuant to § 2 of this Act (§ 83 of the Code) were prepared by the predecessors of the Maryland Geological Survey and establish the boundary between the two counties as being approximately midway between the banks of the Nanticoke and Wicomico Rivers. The Department insists that § 1 of the Act (§ 82 of the Code) means that the boundary is the mid-channel line and not the "center of the waters" between the banks of the river, and that if it means anything else it is void as being contrary to Art. XIII, Section 2 of the Constitution which it argues can only be changed by Constitutional Amendment.

Alternatively, the Department argues that the 1908 Act does not apply at all to a determination of the jurisdictional boundary line along a navigable *river*, citing instead a 1704 Act of the General Assembly, now codified as section 81 of Code Article 75. This earlier statute provides:

"Every county lying on any navigable river in this

State shall extend its jurisdiction from the shore to the channel of the river that divides the counties except where a dividing line has been fixed in such river by law, and, where any ship or other vessel shall be in said river, process may be served on board the said ship or vessel by the officers of either county that can first serve it; but if she is moored or fastened to the land on either side of said river, then she shall be considered as in the county to whose shore she is fastened."

The Department contends that the 1704 Act and not the 1908 Act applies where river boundaries are involved, and that as used in the 1704 Act "channel" has the same meaning advocated by the Department in its interpretation of Article XIII, Section 2 of the Maryland Constitution, *i.e.*, the deep-channel line of rivers, as distinguished from the mid-point between their banks, is the intended jurisdictional boundary between counties bounded by navigable rivers. In our view it is immaterial which of the two Acts applies to the instant case, for in our opinion a proper interpretation of each reaches the same result: The jurisdiction of each county extends to the middle of the river, regardless of the location of the deep-channel line.

In *Raab v. State*, 7 Md. 483 (1855) the Court of Appeals decided that the 1704 Act did not have the effect of making Anne Arundel County an "adjoining county" within the context of the then existing constitutional provisions concerning the right of removal in criminal causes. In the course of its opinion the Court, by way of *dicta*, said: "It is clear that the Act [of 1704] could have had no other effect than to enlarge the limits of Anne Arundel County to the channel . . . ." This statement is not helpful in determining what is meant by "channel". The holding of the case, in a short and frustratingly confusing opinion, was that when, by the Act of 1816, ch. 209, the jurisdiction of Baltimore City was extended to include portions of Baltimore County, Baltimore *County* retained jurisdiction "to at least as far as the channel" of the Patapsco River, resulting in "an

intervening jurisdiction between the city and Anne Arundel County, from which it follows that the record of the present indictment was improvidently transmitted to the circuit court for that county". The Circuit Court for Anne Arundel County, in an opinion by Judge Brewer (reported in full with the report of the *Raab* case) had held that the application of the Act of 1704 to the water boundary (the south side of the Patapsco River) of Anne Arundel County "carries it *to the middle of the stream* . . . ." (Emphasis added). Judge Brewer also held that the Act of 1704, when applied to the area of Baltimore City annexed by the Act of 1816, ch. 209, "would carry the city to the *middle of the river* so far as it extended on it . . . ." (Emphasis added). Judge Brewer further held that the Act of 1704 established the same *rule* for all counties bounded by navigable rivers. After reviewing the "division of other counties subsequent to the Act of 1704" he said, at 491: "Thus we have all counties on the Eastern Shore, except Worcester lying in the interior and not on a river, divided by navigable rivers, so Cecil and Howard, and Harford and Baltimore. What counties have jurisdiction on those rivers, or is there any jurisdiction if the Act of 1704, *establishing a rule* in such cases, does not apply to them?" (Emphasis in original).

In *Acton v. State*, 80 Md. 547 (1895), the Court of Appeals adopted the "views so well expressed by JUDGE BREWER on the point" and held that the 1704 Act applied not only to counties in existence at the time of enactment of the Act but to future counties bounded by navigable rivers as well. The specific holding of the case was that "the jurisdiction of the county [Anne Arundel] is fixed to the centre of the channel [of the Patapsco River] by the Act of 1704 . . . ." Here, again the precise meaning of "channel" is not made clear in the opinion.

In *Western Maryland Tidewater Railroad Company v. Baltimore City*, 106 Md. 561 (1907), the Court of Appeals held that the boundary of the city is not limited to the shore line or to the bulkhead line but is co-incident with the improvements and wharves extended into the water by individual owners, and that those portions of the piers which

extend beyond the bulkhead line are subject to taxation in the city and are not within the jurisdiction of Baltimore County, which adjoins the city on the south. At the end of the opinion Chief Judge Boyd, speaking for the Court, had this to say of the Court of Appeals decision in *Raab*, at 572-73:

"In *Acton v. State*, 80 Md. 547, we held that the jurisdiction of Anne Arundel County did extend to the channel of the Patapsco river — the question which had been left open in Raab's case. *If we were construing the Act of 1704 . . . , without regard to the decision in Raab's case, we would be inclined to adopt a similar view to that of JUDGE BREWER, who decided in the lower Court that by the Act of 1816, ch. 209, the jurisdiction of Baltimore City extended to the middle of the river,* because he thought that when that part of Baltimore County was added to the city, it could not have been intended by the Legislature to leave under the control of the county the water from the shore *to the middle of the river, and as the policy of the State, as declared by the Act of 1704, was to extend the jurisdiction of counties to the channels of navigable rivers it should likewise be construed to apply to Baltimore City.* When Baltimore City was vested with control over the land to the shore it does seem to be singular that an important city like it was then, with the prospect of becoming much more so as it has, should be limited to the line on the shore while the counties could go to the channel. *But without overruling that case, but leaving it to the further action of the Legislature if it deem it proper to change the law in reference thereto, it is clear that Raab v. State, does not conflict with what we have said above.* If the conditions that now exist had existed in 1855, when the Raab case was decided, the Court could have reached the same conclusion it did in that case, for there would still

be an intervening jurisdiction between Anne Arundel and Baltimore City, after extending the limits of the city, so as to include these piers. Indeed, we have considered this case with the concession that up to the time the piers were constructed, the river was under the control of Baltimore County up to the high water mark on the north side of this main branch. That case can therefore in no way be said to be in conflict with this, and we will affirm the order of the lower Court." (Emphasis added).

The above mentioned cases (*Raab*, *Acton* and *Western Maryland*, all *supra*) are the only Maryland cases we have found construing the Act of 1704. From them we reach two conclusions: 1) "Channel" and "middle of the river" are used synonomously, and 2) The *Raab* case created doubt and uncertainty, at least with respect to the jurisdictional boundary of Baltimore City, and the Court in *Western Maryland* invited the Legislature to clear up the matter. *Western Maryland* was decided on November 13, 1907. It seems to us more than a coincidence that at the next session of the General Assembly in 1908 the Legislature responded by enacting Chapter 487, quoted *supra*.

It is certainly true that Section 1 of the 1908 Act is somewhat ambiguous and by no means a paragon of good draftsmanship. What is meant by the phrase, "to the inside of the channel"? That phrase standing alone patently does not describe *a* boundary line between counties. Conceivably, it describes *two* lines: the inside of the channel nearest the Wicomico shore and the inside of the channel nearest the Somerset shore, with a no-man's land between. Such a result was clearly not intended. When read in context with the following phrase, "which shall be regarded to be the, center of said waters", it seems to us to manifest the clear legislative intention that 1) "channel" is used in its primary meaning mentioned earlier in this opinion, and 2) that "the jurisdictional boundary between counties separated by navigable waters" is the geographical center between the

banks of those waters, *i.e.*, "the center of said waters". This is consistent with the lower court's opinion in *Raab* mentioned with such approval by Chief Judge Boyd in *Western Maryland, supra.*

Support for this interpretation is furnished by Section 2 of the Act which speaks, not of the channel, but of the "center of the waters" represented on the county maps "as evidence as to the location of the boundary or boundaries aforesaid".

Further support for this view is gained from the fact that there is every indication that at the time the Act was passed in 1908, the Maryland Geological Survey [3] had already published maps delineating the river boundaries between counties as running down the "center of the waters". Mr. Emery Cleaves, the Assistant Director of the Maryland Geological Survey, testified that the water boundary between the two counties as shown on these official county maps was taken from a U. S. Geological Survey map published in 1903. This map, introduced in evidence (Plaintiff's Exh. 11), contains the notation, "Surveyed in 1900 in cooperation with the State of Maryland", and shows the boundary to be the "center of the waters". Thus it would seem that in 1908 when the Legislature enacted Chapter 487 it was merely adopting as "official and authoritative" the river boundary lines already established by the Maryland Geological Survey.

Aside from what has already been said, the evidence at trial clearly shows that the Geological Survey, in carrying out the legislative mandate imposed by the 1908 Act, has always depicted the water boundary between the two counties as being "the center of the waters". Assuming the Act to be ambiguous and susceptible of more than one reasonable construction this administrative interpretation is entitled to great weight in arriving at the proper interpretation of the Act. In *Farber's, Inc. v. Comptroller*, 266 Md. 44, the Court of Appeals said, at 50: "This Court has commented many times upon long continued and unvarying

---

3. Acting under authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, Chapter 129.

124

construction applied by administrative officials, particularly construction applied soon after enactment of a statute. We have further commented that such construction should not be disregarded except for the strongest and most cogent reasons . . . ." We can think of no "strong" and "cogent" reason for so doing.

We turn now to the Department's contention that the water boundary line of Wicomico County as set forth in Art. XIII, § 2 of the Maryland Constitution can only be changed by amending the Constitution. We consider this contention only on the *assumption* that the Act of 1908 did in fact effect a change. As we have already stated, we do not believe that a proper interpretation of Art. XIII, § 2 and the 1908 Act leads to that result, but assuming that it does we think the Legislature clearly had the power to effect the change.

Section 1 of Art. XIII provides that "The General Assembly may provide, by Law, for . . . changing county lines; but . . . the lines of any county [shall not] be changed without the consent of a majority of the legal voters residing within the district, which under said proposed change, would form a part of a county or of Baltimore City different from that to which it belonged prior to said change . . .; nor shall any change be made in the limits of any county, whereby the population of said county would be reduced to less than ten thousand white inhabitants, or its territory reduced to less than four hundred square miles." Since the "district" between the line as established by the official county maps and the line as contended by the Department is open water, containing no "legal voters residing within", and since the "territory" [4] of neither county is affected, we hold that the Act of 1908 (even assuming it effected a boundary change) was constitutionally permissible.

While we agree with the basic holding of the trial court that the jurisdictional boundary between Somerset and

4. The Act of 1908 did not purport to establish or change the *geographical* limits of counties, but only their *jurisdictional* limits. The Act itself provides that nothing in the three sections of the Act "shall be construed as changing such rights as the State of Maryland may have on or under such waters". Within the context of Art. XIII, § 1, we think "territory" means land area and does not include uninhabited tidal waters.

Wicomico Counties is as shown on the official county maps, we think the second paragraph of its order of December 23, 1974 should be modified in two respects:

1. As drawn the order reads: "The proper boundary between Wicomico County and Somerset County *for the purposes of service of process* is as shown on the county maps . . . ." (Emphasis added). We think this is too restrictive. It seems to indicate that process must be served in the county in which an action is instituted. However, Maryland Rule 104a (Service of Process — Generally. *In or Outside County),* provides that, except as to "a writ of *fieri facias* or other writs of attachment on judgment", process issued from any court may be served on the party named therein wherever he may be found, "whether in or out of the said county". The principal issue with which the parties are concerned in this appeal is which county, Somerset or Wicomico, has *venue* to try the appellee for violations of section 4-1011 (a) of the Natural Resources Article of the Code. In the course of their oral opinion the trial judges held that "the proper place for any prosecution for any violation of law south of this line shown on the topographic maps [the official county maps showing the "center of the waters" as the jurisdictional boundary] . . . [is] in Somerset County". The place where process is *served* is immaterial to determining venue.

2. We think the injunctive provisions of the second paragraph of the order are unnecessary and, in any event, too broad. It purports to enjoin the Department from prosecuting "*any* person in the District Court for Wicomico County, Maryland, for any offenses against the laws of the state alleged to have occurred within the territorial limits of Somerset County, Maryland, as shown on said maps." (Emphasis added). The only evidence offered by the appellee in support of injunctive relief was counsel's proffer that appellee "has been arrested 7 or 8 times, I think, for patent tonging in this area". One case has been disposed of by the dismissal for lack of venue by the Wicomico District Court. All others are, by agreement with the State's Attorney of Wicomico, being held in abeyance pending a final decision in

the instant proceedings. Furthermore, since the first paragraph of the order makes it clear that patent tonging "in the waters of Wicomico County as shown on the Oyster Survey of 1906 to 1912 and its amendments" is prohibited, we will assume that he will abide by that portion of the order as well as the injunction against him. In view of this assumption and in view of the agreement with the Wicomico State's Attorney, there appears to be no legally justifiable reason for the injunction against the Department.

For the foregoing reasons we think the second paragraph of the trial court's order should be modified to read as follows: The proper boundary between Wicomico and Somerset County for purposes of venue is as shown on the county map of Somerset County issued under authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, Chapter 129, a copy of said map having been introduced in evidence in these proceedings, marked "Defendant's Exhibit A".[5] As modified we affirm the order of the trial court.[6]

> *Order modified and as modified affirmed.*
>
> *Costs to be paid by appellant.*

---

5. The map was certified by the Assistant Director of the Maryland Geological Survey as being "the official Md. Geol. Survey Topographic Map of Somerset Co." The evidence is clear that the map of Wicomico County shows the identical boundary line between the two counties.

6. We, of course, do not intend to limit the applicability of Code Art. 27, § 590, in a proper case. In the instant case, however, there appears to be no dispute concerning the geographic situs of the alleged violations. Section 590 provides:

"Any person who may commit any crimes, felony or misdemeanor, on or at the boundary or divisional line between any of the counties in this State, or so near thereto or where the exact location of such boundary is so uncertain as to render it doubtful in which county the offense was committed, then the county which first assumes jurisdiction by issuing process for the arrest and prosecution of the offender shall have jurisdiction to charge, present, indict, try, convict and sentence; and in such case it shall be only necessary for the State to establish the venue alleged in the information, warrant or indictment, by proving that the offense was at or on the boundary of the county wherein the accused is being tried, or was so near thereto or the location of the boundary is so uncertain as to render it doubtful in which county the crime was committed."