# DEPARTMENT OF NATURAL RESOURCES
## *v.* FRANCE

[No. 90, September Term, 1975.]

*Decided April 13, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ▌O'DONNELL, JJ.

*Warren K. Rich, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Henry R. Lord, Deputy Attorney General,* on the brief, for appellant.

No brief filed on behalf of appellee.

▌O'DONNELL, J., delivered the opinion of the Court. SMITH, J., dissents and filed a dissenting opinion at page 465 *infra.*

In this case, we are called upon, for the purpose of venue, to locate the boundary line between two counties separated by a navigable river; at issue is whether the boundary line between Wicomico and Somerset Counties, at the confluence of the Wicomico and Nanticoke Rivers, runs along the mid-point of the geographic center of the water area of the

Wicomico River, or whether it is fixed by the thalweg of the channel of the Wicomico River, located southward of its geographic center line.

The factual posture in which this boundary dispute arose involved the dredging of oysters, by the use of patent tongs, upon two natural oyster bars, the Great Shoals Bar, located at the mouth of the Wicomico River, and the Middleground Bar, located at the mouth of the Nanticoke River, where those rivers converge to form Tangier Sound.

Maryland Code (1974), Natural Resources Article, § 4-1011 (a), prohibits the use of patent tongs to catch oysters in the waters of Wicomico County.[1] "County waters" are defined in § 4-1001 (d), of the same article, as "the waters lying within the territorial limits of any county in the state as defined by the charts of the Oyster Survey of 1906 to 1912, and its amendments."

In late November and early December, 1974, enforcement officers of the appellant, Department of Natural Resources, (the "Department"), apprehended a number of oystermen, including the appellee, Eldridge R. France — who was cited several times — using patent tongs on the Great Shoals and Middleground oyster bars and charged them with violating § 4-1011 (a) of the Natural Resources Article. When the appellee, as the first of the alleged offenders, was brought to trial in the District Court for Wicomico County, the charge against him was dismissed, upon a finding that those portions of the two bars on which the patent tonging had occurred, were located within Somerset County, as shown on the topographic maps, prepared by the Maryland Geological Survey, and were not geographically within Wicomico County.

On December 13, 1974, the Department, acting on behalf of the State, instituted an action in the Circuit Court for Wicomico County, which sought a declaration that "the proper and constitutional boundary between the waters of Wicomico County and Somerset County, for purposes of Title 4 of the Natural Resources Article, is that established

1. The waters of Somerset County are not included within the prohibition.

by the Oyster Survey of 1906 to 1912, and its amendments;" as ancillary relief, the complaint sought that the appellee, and "other holders of licenses to take oysters for commercial purposes by use of patent tongs during the 1974-1975 oyster season" be enjoined from "the taking of oysters by the use of patent tongs . . . from the waters of Wicomico County as defined by the Charts of the Oyster Survey of 1906 to 1912, and its amendments." The appellee countered with a cross-Bill of Complaint, praying that the Department be enjoined from "issuing summons[es] or other charging documents requiring the presence of the Cross-Complainant in the District Court for Wicomico County . . . for offenses allegedly occurring within the territorial limits of Somerset County . . . or the prosecution thereof in the District Court for Wicomico County." [2]

When the matter was heard in the Circuit Court for Wicomico County (before Duer, C. J. and Pollitt, J.),[3] the trial court ruled that "the proper boundary between the waters of Wicomico County and Somerset County, for the purposes of the Natural Resources Article is the channel of the Wicomico River as designated in Article XIII, Section 2, of the Constitution of Maryland, and as shown on the Oyster Survey [Charts] of 1906 to 1912, and its amendments," and that an injunction would issue "prohibiting the taking of oysters by the use of patent tongs, in Wicomico County waters, as shown on [those] maps." The trial court further

---

2. On December 10, 1974, the appellee, France, and a number of other licensed oystermen, filed a Bill of Complaint in the Circuit Court for Somerset County, alleging that despite the ruling by the District Court for Wicomico County, (as to venue) the Department's "officers . . . have continued to wrongfully harass, hinder and interfere with [them] in their daily occupation, by ordering them to cease their lawful tonging of oysters and have continued to arrest [them] and issue summons[es] for them to appear in the District Court for Wicomico County . . . knowing [that] the alleged offenses and act[s] . . . took place in Somerset County . . . and that the District Court for Wicomico County will not hear the cases involving the alleged offenses because of lack of proper venue." The appellee and the other complainants sought to enjoin the Department from such further conduct. A copy of the Bill of Complaint filed in the Circuit Court for Somerset County was filed and incorporated with France's cross-complaint in the Wicomico Circuit Court proceedings. It appears that the complaint filed in Somerset County has not been brought to trial.

3. Judges of the First Judicial Circuit residing, respectively, in Somerset and Wicomico Counties.

held that "the jurisdiction of counties on navigable waters was, for the purposes of service of process, as shown on the topographic maps prepared and distributed according to the provisions of those Sections [82-84] of Article 75" and that it would enjoin the appellant, or any "other law enforcement agency, from bringing prosecution in these cases in Wicomico County because the District Court of Wicomico County has no jurisdiction, the proper place for any prosecution for any violation of the law south of this line [as] shown on the topographic maps being in Somerset County."

The circuit court, by its decree (a) enjoined the appellee and all other holders of patent tong licenses, from "taking . . . oysters by the use of patent tongs in the waters of Wicomico County as shown on the Oyster Survey of 1906 to 1912, and its amendments;" and (b), declared that "the proper boundary between Wicomico County and Somerset County *for the purposes of service of process* is as shown on the county maps of Wicomico and Somerset Counties, issued under [the] authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, Chapter 129 [as set forth in Art. 75, § 83]" (emphasis added), and enjoined the appellant and its agents, "from instituting [the] prosecution of any person in the District Court for Wicomico County . . . for any offenses . . . alleged to have occurred within the territorial limits of Somerset County . . . as shown on said [topographic] maps."

The Department appealed to the Court of Special Appeals from the second portion of the decree. It asserted that the trial court was in error in holding that the jurisdictional boundary line between the two counties was as shown on the topographic maps (to be the geographic center of the river), within the provisions of Code (1957, 1969 Repl. Vol.), Art. 75, §§ 82-84, and, urged a construction of the word "channel" to mean the "natural channel," *i.e.*, the deepest part of the river, contending that the true boundary line, in accordance with Article XIII, Section 2, of the Maryland Constitution, and the provisions of Art. 75, § 81, was the mid-channel line of the Wicomico River.

The Court of Special Appeals, in *Department of Natural Resources v. France*, 28 Md. App. 110, 344 A. 2d 193 (1975), pointing out that the appellee had been enjoined from using patent tongs in the waters of Wicomico County, and that the State's Attorney of Wicomico County had agreed to hold in abeyance the cases involving other oystermen, pending final decision in these proceedings, found that the injunction against the Department, contained in the second portion of the decree, was "unnecessary" and "too broad," and vacated it. That court was further of the view that the declaration made by the circuit court as to the boundary between the two counties was correct, but, limited as it was "for the purposes of service of process," was "too restrictive." The court, noting that pursuant to Maryland Rule 104 a, process issued from any court may be served on the party named therein wherever he may be found, "whether in or out of the said county," and that the principal issue involved the proper *venue* for the trial of the appellee for violations of § 4-1011 (a) of the Natural Resources Article, modified the second portion of the trial court's decree to read as follows: "The proper boundary between Wicomico and Somerset County *for purposes of venue* is as shown on the county map of Somerset County issued under authority of the Laws of Maryland, 1896, Chapter 51, and the Laws of Maryland, 1898, Chapter 129 . . ." (emphasis added) As modified, the decree was affirmed. Finding that a review of the case was "desirable and in the public interest," pursuant to Code (1974), Courts and Judicial Proceedings Article § 12-203, we granted certiorari.

In 1704, the Provincial General Assembly, by the enactment of Chapter XCII, confirmed as "firm and stable forever" the "several Divisions and Partitions" made by the Act of May 8, 1695, which created Prince George's County, and the "several other Divisions and Partitions, Lines and Land-Marks, [which] were made, relating to the Bounds of both" Anne Arundel and Baltimore Counties, which were created by the Act of April 16, 1698. The Act of 1704 then went on to provide:

"III. And whereas there are several Counties that

are divided by navigable *Rivers*, and no Rule yet made how far the Jurisdiction of each County shall extend on the River; BE IT THEREFORE ENACTED *by the Authority aforesaid,* That every County lying on any navigable River, in this Province, shall extend its Jurisdiction From the Shore *to the Channel of such River that divides the County;* and *be divided From the other County by the Channel of the said River.* And that where any Ship or Vessel shall ride at Anchor in the Channel of such River, Process may be served on board said Ship, by the Officer of either County that can first serve it. But when moored by any Hold on the Land, shall be supposed to lie in That County to whose shore she is Fastened, if moored." (emphasis added).

Section III of Chapter XCII of the Acts of 1704 has remained virtually unchanged, except for those changes made by the General Assembly in 1860, when it adopted a Code of Public General Laws. Today it is codified as Art. 75, § 81, and reads as follows:

"§ 81. Jurisdiction of county lying on navigable *river.*

"Every county lying on any navigable river· *in this State* shall extend its jurisdiction from the shore to the channel of the river that divides the counties *except where a dividing line has been fixed in such river by law,* and where any ship or *other* vessel shall *be in said river,* process may be served on board the said ship *or vessel* by the officers of either county that can first serve it; but *if she is moored or fastened to the land on either side of said river, then she* shall be *considered as in the county* to whose shore she is fastened." [4] (emphasis added).

___

4. The italicized portions in Art. 75, § 81 represent the changes made by the Commissioners appointed to review and codify the Acts of Assembly, embracing "all the legislation from the first settlement of the State," and which were adopted by the General Assembly when, in 1860, it enacted a Code of Public General Laws, codifying the Section as Art. 75, § 90, in the Code of 1860. The phrase "except where a dividing line has been fixed in such river by law" was engrafted on the statute.

The statute so provided when, by Article XIII, Sections 2-5, of the Constitution of 1867, provision was made for the creation of Wicomico County, the second youngest county in the State.[5] Wicomico County is the only county in the State whose boundaries are fixed by the Constitution; carved from what was a part of Worcester and Somerset Counties, the boundaries of Wicomico County are fixed by Article XIII, Section 2 of the Constitution, as follows:

> "Beginning at the point, where Mason and Dixon's line crosses the *channel of Pocomoke River*, thence following said line to the *channel of the Nanticoke River*, thence with the *channel of said river* to Tangier Sound, or *the intersection of Nanticoke and Wicomico Rivers*, thence up the *channel of the Wicomico River* to the mouth of Wicomico Creek, thence with the *channel of said creek* and Passerdyke Creek to Dashield's, or Disharoon's Mills, thence with the millpond of said mills and Branch following the middle prong of said Branch, to Meadow Bridge, on the road, dividing the Counties of Somerset and Worcester, near the southwest corner of the farm of William P. Morris, thence due east to the Pocomoke River, then with the *channel of said river* to the beginning, . . ." (emphasis added).

The first case which discusses the Act of 1704, Ch. 92, is *Raab v. State*, 7 Md. 483 (1855). In that case, the appellant, indicted in the Criminal Court of Baltimore City for receiving stolen goods, upon affidavit had his case removed to the Circuit Court for Anne Arundel County. After a verdict of guilty, he filed a motion in arrest of judgment contending that the latter court had no jurisdiction to try his case, since it was not a court of a county "adjoining the city of Baltimore, to which alone the judge of the Criminal Court [of Baltimore] was required by the constitution to remove

5. Garrett County, created by Chapter 212 of the Acts of 1872, is the newest county in the State.

the cause." At issue was: "Whether Anne Arundel county adjoins the city of Baltimore?"

In overruling the motion, Judge Brewer, of the Circuit Court for Anne Arundel County, prefaced his opinion by stating: "[w]here the counties are divided by streams not navigable, in analogy to grants, each of the adjoining counties runs to the *middle of the stream.* * * * The same rule may possibly obtain as to navigable rivers; of that, however, I doubt." 7 Md. at 484.[6] (emphasis added). After reviewing the enactments by which the various counties of the State, then in existence, had been created, he pointed out that the Act of 1704, Ch. 92, confirmed the division between Baltimore and Anne Arundel Counties, as made by the Act of 1698, and that the Act of 1704, "establishing a rule as to the jurisdiction of counties binding on navigable rivers" was not confined in its application to counties then mentioned in the Acts of 1695 and 1698, but "[i]t must have been then contemplated to lay off *other counties,*" and that "the object of the Act of 1704" "seems to be to *establish a rule* applicable to all *similar cases.*" 7 Md. at 486-87. (emphasis in original).

That court, then finding that the Act of 1726, Ch. 1, had repealed so much of the Act of 1698 as added the south side of the Patapsco River to Baltimore County, and had fixed the boundary of Anne Arundel County as lying on the south side of the Patapsco and running with that river, reasoned that "if the Act of 1704 applies to counties subsequently laid off, [that Act] carries it [the boundary of Anne Arundel County] to the *middle of the stream,* and at any rate would leave to Baltimore County only half of the river, precisely the same as if a law bounded it on the north side." 7 Md. at 488 (emphasis added).

Pointing out that the Act of 1816, which engrafted portions of Baltimore County onto the limits of Baltimore City had fixed the boundary of the City, "on the *main branch* of the Patapsco River 'and running with and bounding on

---

6. The full opinion of Judge Brewer, in the Circuit Court for Anne Arundel County, was set forth with the report of the decision of this Court in Raab v. State, 7 Md. 483, 483-93 (1855).

the main branch' " of that river, and had included "all the land on the south side of the old city limits, which was in Baltimore county," Judge Brewer concluded that the city boundary "[r]unning with the river, if the county ran with the river, . . . would certainly give to the city all the rights of the county connected with the land, which would carry the city *to the middle of the river* so far as it extended on it, which right [as to navigation] is indispensable to the city." 7 Md. at 492. (emphasis added). In holding that Anne Arundel County thus adjoined Baltimore City, the Anne Arundel County Circuit Court was of the view that the "idea of Anne Arundel county holding the land on one side of the river and the city of Baltimore on the other, while Baltimore county held *the middle of the stream,* is neither a useful, practical, nor liberal construction of the Acts of the Legislature." 7 Md. at 492. (emphasis added).

Although the Patapsco was a navigable river, the Circuit Court for Anne Arundel County, though undertaking to give effect to the Act of 1704, contrary to that court's original premise, characterized the boundary between Baltimore City and Anne Arundel County to be "the middle of the stream" — as if the Patapsco were a non-navigable river — rather than to the "channel" of that river, in accordance with the express terminology in the Act of 1704.

Our predecessors in *Raab*, in reversing, disagreed with the view that Baltimore City, by the Act of 1816, had acquired jurisdiction "as far as the channel" over that portion of the Patapsco River lying between it and Anne Arundel County. Pointing out that that statute, fixing the annexed portion of Baltimore City, limited its boundaries as "on the main branch of the Patapsco river, and running with and bounding on the said main branch," the jurisdiction of the City was confined to the limits prescribed, "[and] part of the river at least was left within [the jurisdiction] of Baltimore county;" there was thus an intervening jurisdiction between the City and Anne Arundel County.

Although our predecessors were of the view that a resolution of the issue there involved did not depend upon the Act of 1704, the Court did not embrace the lower court's

view that the boundary of Anne Arundel County was the "middle of the stream" of the Patapsco River, but referred instead to the "channel" of that river as constituting the boundary between Anne Arundel and Baltimore Counties. Judge Tuck, who delivered the opinion for the Court, stated:

"It is manifest that the river [Patapsco], after this Act, [Act of 1726] remained as it had been for many years, within the limits of Baltimore county, and that the jurisdiction of these counties adjoined on its southern shore, unless affected by the Act of 1704, ch. 92, . . . and, under this Act, if applicable, the river, as far as the *channel*, remained in Baltimore county, and subject to the jurisdiction of its courts. * * * We are of the opinion, that the present case does not depend on that Act of Assembly, for the reason about to be stated.

"It is clear that the Act could have had no other effect than to enlarge the limits of Anne Arundel county to the *channel*, and that it did not extend the line of Baltimore county into the river. If it operated on these counties at all, its effect was to restrict the southern line of Baltimore county to the *channel*, and not to assign to it any jurisdiction not previously possessed. Before the Act, this county had within its limits all the river, and afterwards, at least as far as the *channel*." 7 Md. at 497-98. (emphasis added).

In *Acton v. State*, 80 Md. 547 (1895), the appellant was charged in Anne Arundel County in a criminal information with a violation of the Sabbath, "at a building erected in the waters of a navigable river . . . the Patapsco River . . . on the south side of the channel of said river, and distant less than one hundred yards of the land shore . . . of [said] county." Contending that the site where the alleged offense was committed was not within the limits of Anne Arundel County, the defendant pleaded a want of jurisdiction; the State's demurrer to the plea was sustained. In affirming,

Judge Page, writing for our predecessors, quoted from Judge Tuck's opinion in *Raab v. State, supra,* and stated:

"So that, under this decision, [*Raab v. State*], it is clear that if the Act of 1704, ch. 92, is applicable, the jurisdiction of Anne Arundel County must extend to the *channel* of the river, and will include all that space which lies between the limits of Anne Arundel County as described in the Act of 1727, and the *channel.* And we are of the opinion that *such is the proper application of that Act.*" 80 Md. at 549 (emphasis added).

The Court further adopted "the views so well expressed by Judge Brewer in his opinion . . . in the lower Court in *Raab v. State, supra,*" that "the object of the Act of 1704, although it refers only to the counties already laid off, seems to be to establish a rule applicable in all similar cases." Eschewing the use of the term "middle of the stream" as the boundary of Anne Arundel County, the Court, applying the Act of 1704, firmly established that such boundary extended to the "channel" of the Patapsco River, when it further stated:

"This Act [1704] has been codified . . . and differs from the Act as originally passed, only in the respect that it is not made to apply 'where a dividing line has been fixed in such river by law.' No such line has been fixed with respect to Anne Arundel. By the adoption of the Code *this section became the law of the State,* and is now applicable, whatever may originally have been the design of those who enacted it, *to every county lying on navigable rivers in the State, except 'where a dividing line has been fixed in such river by law.'*" 80 Md. at 550 (emphasis added).

The appellant, in *Western Maryland Tidewater Railroad Co. v. Mayor and City Council of Baltimore,* 106 Md. 561, 68 A. 6 (1907), challenged the validity of tax assessments by the City upon piers built by it, which extended from the shore or bulkhead line, out over the waters of the Patapsco River,

contending upon the holdings in *Raab v. State, supra,* that jurisdiction over the river, out from the shoreline, continued to remain with Baltimore County. Pointing out that under Ch. 129 of the Acts of 1862, the owners of land binding on the water had the right to make improvements by the construction of wharves, piers, etc., out from the shore and that such improvements belonged to the owners of the land "as incident to their respective estates," our predecessors held that such piers were subject to taxation by the City and not within the jurisdiction of Baltimore County.

Noting that in *Raab v. State,* the boundary of Baltimore City had been limited to the shore along the Patapsco River, and that in *Acton v. State,* the boundary of Anne Arundel County had been established at the "channel" of the Patapsco, the Court, in an opinion by Chief Judge Boyd, although expressly not overruling the decision in *Raab,* nonetheless embraced the view, which had been stated by Judge Brewer (in the lower court in *Raab*), that the boundary of Baltimore City should likewise be held to extend into the Patapsco River, so as not to cut off so important a city as Baltimore from control and jurisdiction of the waters of such a navigable river.

Chief Judge Boyd stated:

> "[In *Raab v. State,*] [o]ur predecessors held that after the Act of 1726 the river remained, as it had been for many years, within the limits of Baltimore County, except so far as affected by the Act of 1704, ch. 92, which provided that every county lying on any navigable river in the province should extend its jurisdiction from the shore to the *channel* of such river, and be divided from the other county by the *channel.* Our predecessors did not pass on the Act of 1704, but held that the river was still in Baltimore County at least as far as the *channel,* and was subject to the jurisdiction of its Courts. In *Acton v. State,* 80 Md. 547, we held that the jurisdiction of Anne Arundel County did extend to the *channel* of the Patapsco river — the question

which had been left open in Raab's case. If we were construing the Act of 1704, . . . without regard to the decision in Raab's case, we would be inclined to adopt a similar view to that of Judge Brewer, who decided in the lower Court that by the Act of 1816, ch. 209, the jurisdiction of Baltimore City extended to the middle of the river, because he thought that when that part of Baltimore County was added to the city, it could not have been intended by the Legislature to leave under the control of the county the water from the shore to the middle of the river, and as the policy of the State, as declared by the Act of 1704, was to extend the jurisdiction of counties to the *channels* of navigable rivers it should likewise be construed to apply to Baltimore City. When Baltimore City was vested with control over the land to the shore it does seem to be singular that an important city like it was then, with the prospect of becoming much more so as it has, *should be limited to the line on the shore while the counties could go [to] the channel.* But without overruling that case, . . . it is clear that *Raab v. State*, does not conflict with what we have said above." 106 Md. at 572-73, 68 A. at 11. (emphasis added).

In sustaining the constitutionality of Ch. 82 of the Acts of 1918, which annexed a portion of Anne Arundel County to Baltimore City, our predecessors, in *McGraw v. Merryman*, 133 Md. 247, 104 A. 540 (1918), noted that the boundary of Anne Arundel County ran to "the current of the river."[7] Chief Judge Boyd, who also authored that opinion for the Court, stated:

"[I]t was decided in *Raab v. State* 7 Md. 483, that the Act of 1816, Chapter 209, extending the boundaries of that city, limited its lines to the north

7. The area "where the current flows" is embraced within the definition of a "channel." *See* The Northern Queen, 117 F. 906, 915 (W.D.N.Y. 1902).

side of the river, thus leaving the portion of the river between the north shore line *and the current* (to which the Anne Arundel County line extended) in Baltimore County. Although it was intimated in *West. Md. T. R. Co. v. Baltimore City,* 106 Md. 561, that but for that decision we might have held the contrary, we expressly declined to overrule it. But treating the boundaries of Baltimore County as inclusive of the space in the river between the Anne Arundel County line, *in the current of the river,* and that of the city, this Act can not be held to be invalid for that reason." 133 Md. at 258-59, 104 A. at 544. (emphasis added).

In 1908, the General Assembly enacted Ch. 487, which is set forth in Code (1957, 1969 Repl. Vol.), Art. 75, §§ 82-84. That enactment, without making any reference to Ch. 92 of the Act of 1704, or to boundaries along "navigable *rivers*," undertook to fix the jurisdiction of every county bounded by "navigable *waters*." The statute read as follows:

"AN ACT to define the jurisdiction of counties, and to supply maps showing the same to the officials of the counties of this State.

"WHEREAS, Some doubt exists as to the jurisdiction of certain counties situated on the navigable *waters* of the State; therefore:

"SECTION 1. *Be it enacted by the General Assembly of Maryland,* That the jurisdiction of every county bounded at any point by navigable *waters* shall extend from the shore to the *inside of the channel,* which shall be regarded to be the *center of said waters,* except where said waters adjoin neighboring States, in which case the jurisdiction of said counties shall continue to the ultimate limits of the State at the place in question; provided, however, that *nothing in this Act shall be construed as changing such rights as the State of Maryland may have on or under such waters.*

"SEC. 2. *Be it further enacted,* That the *center of the waters* aforesaid shall be deemed to be *as represented on the county maps* issued under authority of the Laws of Maryland, 1896, chapter 51, and the Laws of Maryland, 1898, chapter 129, and said maps shall be admissible as evidence *as to the location of the boundary or boundaries aforesaid.*[8]

"SEC. 3. *Be it further enacted,* That certified copies of said county maps shall be filed with the clerks of the several courts for all the several counties of Maryland, and also with the Board of County Commissioners of said counties; *said maps to be regarded as official and authoritative.*" (emphasis added).

In *Barnes v. State,* 186 Md. 287, 47 A. 2d 50, *cert. denied,* 329 U. S. 754 (1946), where jurisdiction in the Circuit Court for Prince George's County was upheld over a criminal offense committed upon the Potomac River, Chief Judge Marbury pointed out:

"By the Act of 1908, Chap. 487, is emphasized the fact that the jurisdiction of the Southern Maryland counties extends to the ultimate limits of the state across the Potomac River, which would be to low water mark on the Virginia shore. In all other cases where navigable waters divide counties, the *jurisdiction of the bordering counties extend to the center of the channel,* but the exception clearly

---

8. Ch. 51 of the Laws of 1896 established a State Geological and Economic Survey Commission: (1) to examine the geological formations of the State, (2) to examine and classify the soils and their adaptability to particular crops, (3) to examine the physical features of the State, (4) to prepare special geological and economic maps to illustrate the resources of the State, and (5) to prepare special reports, with illustrations and maps, embracing both a general and detailed description of the geological and natural resources of the State.

Ch. 129 of the Laws of 1898 authorized the completion of the topographic survey of the State, and provided for the publication of topographic maps and reports dealing with the mineral products and natural resources of each county of the State.

refs to the Southern Maryland counties, because they are the only ones which border on navigable waters where a neighboring state is on the other side." 186 Md. at 309, 47 A. 2d at 60. (emphasis added).

It is noteworthy that in *Barnes,* our predecessors, although taking cognizance of the provisions in Ch. 487 of the Act of 1908, nonetheless pointed out that the jurisdiction of counties, bordering upon navigable waters, extended "to the center of the *channel*" of those waters, rather than "to the center of the waters."

In upholding the declaration made by the circuit court that "[t]he proper boundary between Wicomico County and Somerset County . . . is as shown on the [topographical] county map of Somerset County," the Court of Special Appeals prefaced its holding by quoting the definitions of "channel," "main channel" and "natural channel," set forth in Black's Law Dictionary (Rev. 4th ed. 1968), and the definitions of "channel," in Webster's Third New International Dictionary (1967). Concluding from these definitions that the term "channel" could denote the "bed in which the main stream of a river flows" or "the line delineating the deepest part of a river where the main current flows," the court adopted the former, or middle-of-the-river meaning. Although recognizing that the word "channel," "when employed in treating of subjects connected with the navigation of rivers and bays, indicates the line of deep water which vessels usually (but not always) follow," that court, citing *Dunleith & Dubuque Bridge Co. v. County of Dubuque,* 55 Iowa 558, 8 N. W. 443 (1881) (which was later rejected by the United States Supreme Court in *Iowa v. Illinois,* 147 U. S. 1 (1893)), expressed the view that a line fixed in the deepest part of a river where the main current flows "[a]s a precise boundary line between counties, however, . . . is all but illusory and fosters uncertainty where certainty should exist." 28 Md. App. at 117, 344 A. 2d at 198.

From these premises, that court, in holding that the

boundary between the two counties was the geographic mid-line of the Wicomico River, stated:

"It seems to us more likely that the framers of the 1867 Constitution used the word channel in its primary sense as meaning the great body of water between the banks of the river, and that, by analogy to the common law rule pertaining to non-tidal stream boundaries, the intended boundary was a line running along the middle of the river." 28 Md. App. at 117, 344 A. 2d at 199.

In support of its conclusion, the Court of Special Appeals drew upon the phrases "to the middle of the stream" and "to the middle of the river," as used by Judge Brewer in the lower court opinion in *Raab v. State, supra,* and the citation of his opinion and the use of the term "to the middle of the river" set forth in *Western Maryland Tidewater Railroad Co. v. Mayor and City Council of Baltimore, supra;* without reference to the term "to the current of the river" as used in *McGraw v. Merryman, supra,* that court was of the view that the term "channel," as set forth in the Act of 1704, and as used in the opinions of this Court in *Raab, Acton* and *Western Maryland Tidewater Railroad,* had been used synonymously with the term "middle of the river." Finding that "doubt and uncertainty" had been created with respect to the jurisdictional boundary of Baltimore City by the decision in *Raab,* the court surmised that it was "more than a coincidence" that the legislature enacted Ch. 487 of the Acts of 1908 in response to the language of Chief Judge Boyd in *Western Maryland Tidewater Railroad,* and that that statute manifested the clear legislative intention that "channel" was to be used in its primary sense — as the geographic middle of the river — and that " 'the jurisdictional boundary between counties separated by navigable waters' is the geographical center between the banks of those waters, *i.e.,* 'the center of said waters.' " It found this view to be "consistent with the lower court's opinion in *Raab* mentioned with such approval by Chief

Judge Boyd in *Western Maryland, supra."* 28 Md. App. at 122-23, 344 A. 2d at 202.

In arriving at the result reached, the Court of Special Appeals found it to be immaterial whether the Act of 1704, or the Act of 1908, was applicable "for in our opinion a proper interpretation of each reaches the same result: The jurisdiction of each county extends to the middle of the river, regardless of the location of the deep-channel line." 28 Md. App. at 119, 344 A. 2d at 200.

We do not agree either with the rationale or the conclusion reached by the lower court.

At the outset, it seems to us that no analogy can be drawn to the common law rule pertaining to non-tidal stream boundaries in undertaking to fix a boundary upon navigable waters. Although it is true "that a grant, by the owner of the bed of a non-navigable stream, of land *bounding thereon,* conveys, even without express language, ownership to the middle of the stream." *Linthicum v. Shipley,* 140 Md. 96, 99, 116 A. 871, 872 (1922); *Day v. Day,* 22 Md. 530 (1865); *Browne v. Kennedy,* 5 H. & J. 195 (1821), a person owning land, abutting on navigable water, where the land under the navigable water is owned by the state, owns title only to the high water mark — subject of course to certain riparian rights as an incident to his ownership of such land. *Van Ruymbeke v. Patapsco Industrial Park,* 261 Md. 470, 475, 276 A. 2d 61, 64 (1971); *Toy v. Atlantic Gulf and Pacific Co.,* 176 Md. 197, 206, 4 A. 2d 757, 762 (1939); *Smoot Sand and Gravel Co. v. Columbia Granite and Dredging Corp.,* 146 Md. 384, 388, 126 A. 91, 92 (1924). *See also Green v. Eldridge,* 230 Md. 441, 446, 187 A. 2d 674, 676 (1963).

Although we recognize that the term "channel," in connection with water courses, has at times been referred to as "the bed in which the main stream of a river flows," or "the hollow bed where a natural body, or stream of water runs or may run," where navigable waters are concerned, the term more appropriately refers to that portion of the waters on which vessels move and "the deeper part of a river, where the main current flows, or which affords the

best passage" for vessels. *See The Oliver,* 22 F. 848, 849 (E.D. Va. 1885); *The Northern Queen,* 117 F. 906, 915 (W.D.N.Y. 1902) (where "[a] 'channel' is defined . . . to be 'the deeper part of a river, or of an estuary, bay, etc., where the current flows, or which is most convenient for the track of ships.' "); *The Sarah v. Bellais,* 52 F. 233, 235 (5th Cir. 1892) (where it was held that "[t]he term 'channel' is properly applied to the portion of the bed of a river or canal which furnishes uninterruptedly, through its course, the deepest water . . .").

In our appraisal of the term "channel," as used in the Act of 1704, Ch. 92, we think it is here of significant importance to point out the observation made by our predecessors, in *Toy v. Atlantic Gulf and Pacific Co., supra,* that a channel, in navigable waters, is a "highway by water" of commerce. Judge Parke, for our predecessors, there stated:

> "To the extent of its public use in the transportation by boat of person and property, the channel of Back Creek was a highway by water, although it was not actually adapted for passage by any but small craft, such as row boats and small launches, but to that extent it continued to serve a limited public purpose while its waters in the canal bore the vessels engaged in general commerce and transportation." 176 Md. at 206, 4 A. 2d at 762.

It seems clear that the Act of 1704 was passed at a time when the primary means for the transportation of goods over extended distances within the Colony, and the principal means of communication between its populated areas, were these "highways of water." From our reading of Judge Brewer's trial court opinion in *Raab,* and from the opinion by Chief Judge Boyd in *Western Maryland Tidewater Railroad,* we are persuaded that the underlying concept, in each of those opinions, was a recognition of the need for Baltimore City to have such a "highway of water" for its commerce.

It was undoubtedly in recognition of such water-borne commerce that the General Assembly, in enacting Ch. 92 of the Act of 1704, intended to carry the jurisdiction of

counties, bordering on navigable rivers, to the channel of such rivers, where a "Ship or Vessel shall ride at Anchor," and to provide for the service of process upon vessels, within the navigable portions of such rivers, *i.e.*, the channels, by an officer of either of the bounding counties.

In a case involving an issue substantially similar to that presented here, the Supreme Judicial Court of Maine, in *Warren v. Thomaston*, 75 Me. 329 (1883), was confronted with interpreting a statute which fixed the boundary line between the towns of Warren and Thomaston. The Maine legislature, in 1864, using language similar to that used in Article XIII, Section 2 of our Constitution (fixing the boundaries of Wicomico County), undertook to fix the "town line between the towns of Thomaston and Warren,'" as follows: ' "[b]eginning in the centre of the channel of Oyster river, below Elder point, near the head of tide water, where the town lines now cross said river, and following down said river in the channel to the channel of Georges river; thence down said channel, till it intersects the town line where it crosses said Georges river." ' At issue was whether the boundary of the two towns was the central line of the Georges river or the channel thereof. That court, in holding that the channel of the river fixed the boundary, stated:

> "The line, in the case under consideration, runs not by Georges river, but to and then down its channel. *The channel is the deepest part of the river. It is the navigable part — the water road over which vessels pass and repass. It is the highway of commerce.* Had the line run to the river and down the river, the boundary would have been the thread of the stream — the *filum aquae*. But, the thread of a stream is the middle line between the shores, irrespective of the depth of the channel, taking it in the natural and ordinary stage of the water. The channel and the thread of the river are entirely different. The channel may be one side of the thread of the river or the other. The legislature exclude[d] the idea of the thread of the river as the

boundary and establish[ed] a totally different one — the channel of the river. . . . Hence, not the river, but the channel is made the boundary, so that the burden resting upon these towns may thus be equalized." 75 Me. at 332 (emphasis added).

Drawing an analogy to grants of land bounded on a highway, the court further stated: "[w]hether the highway be by land or water, the same rule of construction must apply. When the river is a boundary, the thread of the stream is the dividing line. When the channel, as here, is the boundary, the thread of the channel is constituted the boundary. The *Cold Spring Iron Works v. Tolland,* 4 Cush. 492." 75 Me. at 332-33.

By a comparison of the boundary issue presented in *Warren v. Thomaston, supra,* with the issue to be resolved in this case, it would appear, under the holdings by the Maine court, that if the Constitutional Convention of 1867, when it adopted Article XIII, sec. 2, fixing the boundary of Wicomico County, had intended that the geographic middle of the Wicomico River be the boundary between Somerset and Wicomico Counties, it would have provided that the boundary of such county would run "to the [Wicomico] River" and "up [that] River," rather than have chosen the term "up the channel of the Wicomico River." This same reasoning is equally applicable to the enactment of Ch. 92 of the Act of 1704, when the General Assembly used the terminology "to the channel of such river that divides the counties." *Compare Taylor v. State,* 79 Md. 130, 28 A. 815 (1894), in connection with the bounds of Talbot County, fixed by Ch. 3, of the Act of 1706, as "on the north side of Great Choptank River" and "up said River to Tuckahoe Bridge; . . . and from thence down the south side of Wye River to the mouth thereof, and from thence down the bay (including Poplar Island) . . ."

Another case strikingly similar upon its facts is *Pratt v. State,* 5 Conn. 388 (1824). Pratt, while taking oysters in the channel of the Connecticut River, about 20 rods from its eastern bank and about 100 rods from its western shore, was

charged in a criminal information with having assaulted a constable of the town of Lyme, who undertook to arrest him upon a writ of attachment. Challenging the jurisdiction of the court, Pratt asserted that he was not, at the time of his arrest, within the limits or jurisdiction of the town of Lyme. The Supreme Court of Errors of Connecticut, finding that the patent of Lyme, granted in 1685, bounded it *"Westerly on the channel of [the] Connecticut river,"* and that the patent of Saybrook, in the same year, bounded it *"on [the] Connecticut River, on the east"* concluded that Saybrook was "bounded by *the margin*" of the river and that the offense committed by Pratt, *"in the channel of the river,"* between the two towns," "was not within the patented limits of either town." The court further held however that "the jurisdiction of *Lyme,* so far as [it] relate[d] to the service of process and enforcement of the laws," from "antient and invariable and undisputed usage," extended "to the *centre of the channel* [of the Connecticut River]" and that the constables of Lyme had the right to serve legal process at the place of the alleged assault. 5 Conn. at 390-91. (emphasis added).

In a most noteworthy case where a similar issue was raised, concerning the boundaries of the States of Iowa and Illinois, upon the Mississippi River, the United States Supreme Court held that their boundary was not the geographic midline between the banks of that river, but rather was the thalweg, or the middle of the main navigable channel of that river.

Mr. Justice Field, writing for the Supreme Court in *Iowa v. Illinois, supra,* established what has become well known as the "thalweg doctrine," when he stated:

> "When a navigable river constitutes the boundary between two independent States, the line defining the point at which the jurisdiction of the two separates is well established to be the middle of the main channel of the stream. The interest of each State in the navigation of the river admits of no other line. The preservation by each of its equal right in the navigation of the stream is the subject

of paramount interest. It is, therefore, laid down in all the recognized treatises on international law of modern times that the middle of the channel of the stream marks the true boundary between the adjoining States up to which each State will on its side exercise jurisdiction." 147 U. S. at 7-8.

Expressly rejecting the view adopted by the Iowa Supreme Court in *Dunleith & Dubuque Bridge Co. v. County of Dubuque, supra,* (cited by the Court of Special Appeals), the Court quoted with approval from the decision of the Supreme Court of Illinois in *Buttenuth v. St. Louis Bridge Co.,* 123 Ill. 535, 548, 17 N. E. 439, 444 (1888), as follows:

" 'It is the free navigation of the river — when such river constitutes a common boundary, that part on which boats can and do pass, sometimes called "nature's pathway" — that States demand shall be secured to them. When a river, navigable in fact, is taken or agreed upon as the boundary between two nations or States, the utility of the main channel, or, what is the same thing, the navigable part of the river, is too great to admit a supposition that either State intended to surrender to the State or nation occupying the opposite shore the whole of the principal channel or highway for vessels and thus debar its own vessels the right of passing to and fro for purposes of defence or commerce. That would be to surrender all, or at least the most valuable part, of such river boundary, for the purposes of commerce or other purposes deemed of great value, to independent States or nations.' " 147 U. S. at 13.

In concluding that "the boundary line between the State of Iowa and the State of Illinois is the middle of the main navigable channel of the Mississippi River," the Court stated:

"[W]e are of [the] opinion that the controlling consideration in this matter is that which preserves to each State equality in the right of navigation in

the river. We therefore hold, in accordance with this view, that the true line in navigable rivers between the States of the Union which separates the jurisdiction of one from the other is the middle of the main channel of the river. Thus the jurisdiction of each State extends to the thread of the stream, that is, to the 'mid-channel,' and, if there be several channels, to the middle of the principal one, or rather, the one usually followed." 147 U. S. at 13.

The "thalweg doctrine" was similarly applied in *Louisiana v. Mississippi*, 202 U. S. 1 (1906) where the Court held that "the deep water channel sailing line," in the waters of Lake Borgne, was the boundary between those two states. *See also Arkansas v. Tennessee*, 246 U. S. 158 (1918) (where the boundary had been specified as "along the middle of said Mississippi River"); and *Whiteside v. Norton*, 205 F. 5 (8th Cir. 1913), where a portion of the boundary between Wisconsin and Minnesota was fixed as the "main channel of the St. Louis River," and that court stated:

"If this, then, be the St. Louis river, not only is the boundary between Wisconsin and Minnesota declared by legislative enactment to be the middle of its main channel — as that channel then existed — but the doctrine of the 'thalweg,' meaning the middle, or deepest, or most navigable, channel, is applicable in determining the line of boundary between the two states." 205 F. at 9.

It appears to us that such considerations as "the preservation by each [of the bounding jurisdictions] of its equal right in the navigation of a stream" and the preservation of the "free navigation of the river" were of primary importance in the Province in 1704, when the 11 existing counties, all upon tidewater, were bounded by navigable rivers and were economically dependent on those rivers as "highways of water" for their economic survival.[9] It

---

9. Those Counties and the years in which they were founded, were: Anne Arundel (1650), Baltimore (1659-1660), Calvert (1654), Cecil (1674), Charles

thus seems clear that it was the intent of the General Assembly, by the express use of the term "channel," when it enacted Ch. 92 of the Acts of 1704, to extend, and to insure, the jurisdiction of every county, bounding on a navigable river, to the thalweg, or the middle of the main navigable channel of every such river which constituted a boundary between counties.

The General Assembly patently did not intend that the navigable channel in such a river should lie wholly within the jurisdiction of one or the other of the counties on opposite shores — a result which could conceivably occur — should such boundary be fixed at the geographic mid-point between the banks of such a river. It appears to have been in recognition of such mutual jurisdictional rights by the bounding counties, in the use of the channel of such a river, that the Act of 1704 provided for the service of process, by the officers of either of such bounding counties, upon a vessel "rid[ing] at Anchor in the Channel of such River."

Although the language used in *Western Maryland Tidewater Railroad Co. v. Mayor and City Council of Baltimore, supra,* appears to be in conflict with the use of the term "channel," as used in *Raab v. State, supra,* and in *Acton v. State, supra,* and in conflict with the phrase "the current of the river," as used in *McGraw v. Merryman, supra,* as we read those cases, they support the concept that when our predecessors used the term "channel," they intended it to mean not the geographical middle of the Patapsco River, but rather "the deeper part of the river, where the main current flows" and "which affords the best passage" for vessels.

When the statute was codified in 1860, the legislature, by engrafting upon the original enactment the limitation "except where a dividing line has been fixed in such river by law," made allowance for those counties "bordering upon the Potomac River." *See Barnes v. State, supra.* It also appears

(1658), Dorchester (1668-1669), Kent (1640-1642), Prince George's (1695), St. Mary's (1637), Somerset (1666), Talbot (1661-1662). *See* Maryland Manual, 1973-74, pp. 868-70.

that allowance was made for those counties, binding on navigable rivers which had prior thereto been created, sometimes by an Order, or a Proclamation by the Governor, sometimes by an Order of the Council and more often, by Acts of the General Assembly. *See Maryland Manual* (1973-74) pp. 867-870 (in connection with the origin of the various counties of the State).

When the framers of the Constitution of 1867 created Wicomico County, and carved it out of what previously had been Worcester and Somerset Counties, they were obviously cognizant of the provisions in the Act of 1704, then codified as Art. 75, § 90, and mindful of the use of the term "channel" as used by our predecessors, in 1855, in *Raab v. State, supra,* in connection with the boundary line in the Patapsco River. When they chose specifically to fix the boundary as "to the channel of the Nanticoke River" (separating Wicomico and Dorchester Counties) (rather than as proposed to the "middle" of that river) and "thence with the channel of [the Nanticoke River] to Tangier Sound, or the intersection of [the] Nanticoke and Wicomico Rivers, thence up the channel of the Wicomico River to the mouth of Wicomico Creek, [and] thence with the channel of said creek," etc., (separating Wicomico and Somerset Counties); and when they further fixed the boundary in part (separating Wicomico and Worcester Counties) at "the channel of the Pocomoke River" and "with the channel of said river," [10] the framers obviously intended to preserve and to insure the jurisdiction of each of those four counties to the channels of the three named rivers and to continue the mutual rights of navigation in those rivers which, as they had in Colonial times, in 1867, continued to play a significant role, as "highways of water" to counties bounding on navigable

---

10. Although the committee, which submitted what later became Article XIII, § 2 of the Constitution of 1867, provided that the boundary of Wicomico County would run "with the *middle* of said [Nanticoke] River to Tangier Sound" and would run "to the mouth of Wicomico Creek," the Convention, apparently without debate, amended these respective provisions to read "with the *channel* of said [Nanticoke] River to Tangier Sound" and "with the *Channel* of said [Wicomico] creek and Passerdyke Creek." *See* P. Perlman, *Debates of the Maryland Constitutional Convention of 1867,* 322 (1923). (emphasis added).

rivers. *See Iowa v. Illinois, supra; Buttenuth v. St. Louis Bridge Co., supra;* and *Warren v. Thomaston, supra. See also* 10 Op. A. G. 75 and 81 (1925).

It thus seems clear to us that Article XIII, § 2 of the Constitution intended to fix the boundary between Wicomico and Somerset Counties at the middle of the channel in the Wicomico River and to extend it, in that line, to its intersection, in Tangier Sound, with the middle of the main channel of the Nanticoke River.

As we see it, this interpretation of the term "channel," as used in the Act of 1704 and in Article XIII, § 2 of the Constitution, is unaffected by the language used in Section 1, Ch. 487 of the Act of 1908, now codified as Art. 75, § 82, which was applied both by the trial court and by the Court of Special Appeals.

We do not agree with the surmise that Ch. 487 of the Act of 1908 was enacted in response to the decision in *Western Maryland Tidewater Railroad* and to remove the "doubt and uncertainty" which the lower court found had been created by the decision in *Raab v. State, supra.* It would appear that that statute was enacted in response to the problem demonstrated by the decision in *Taylor v. State, supra,* where the place at which the appellant was taking oysters with a "scoop" — "opposite Tilghman Island" and "inland from a line drawn from Sharp's Island to Poplar Island," — was held not to be within the boundaries of Talbot County, but outside thereof and upon the waters of the Chesapeake Bay.

Such a view is in accord with that adopted by the Circuit Court for Queen Anne's County in *State v. Thomas* (No. 50, Criminal Trials, 1957), where Chief Judge Horney (later a Judge of this Court), in holding that Ch. 487 of the Acts of 1908 extended the jurisdiction of Queen Anne's County over the waters of the Chesapeake Bay, between the westerly shore of Kent Island and the center of the Bay, stated:

"The Laws of 1704, Ch. 92, *supra,* settled only the extent of county jurisdiction over navigable *rivers.* From 1704 to 1908 the question of jurisdiction over

navigable *waters* of the State, other than *rivers*, remained in doubt. In order to remove all doubt which until then existed 'as to the jurisdiction of certain counties situated on all navigable *waters* of the State' as declared in its preamble, the Acts of 1908, Ch. 487, *supra*, indubitably extended the jurisdiction of Queen Anne's County over a portion of the waters of Chesapeake Bay." (emphasis added).

In acquitting the defendant of a violation of the clamming laws, Judge Horney pointed out that the maps, prepared by the Maryland Geological Survey, in cooperation with the United States Geological Survey, pursuant to Ch. 51 of the Acts of 1896, and Ch. 129 of the Acts of 1898 (as referred to in Art. 75, § 83), showed "the boundary of Queen Anne's County as extending to approximately the center of the Chesapeake Bay." *See also Barnes v. State, supra.*

It is a fundamental principle that the law does not favor repeals by implication, *Waye v. State*, 231 Md. 510, 516, 191 A. 2d 428, 431 (1963); *State v. Clifton*, 177 Md. 572, 574, 10 A. 2d 703, 704 (1940). A latter statute should not be held to repeal by implication an earlier one "unless there is some express reference to the previous statute, or there is a manifest inconsistency in the two statutes, or their provisions are so repugnant that they cannot stand together." *Kirkwood v. Provident Savings Bank*, 205 Md. 48, 55, 106 A. 2d 103, 107 (1954). As was stated in *Bowie v. Washington Suburban Sanitary Comm'n*, 249 Md. 611, 618, 241 A. 2d 396, 400 (1968), such repeals "will not be found unless demanded by irreconcilability or repugnancy." *See Pressman v. Elgin*, 187 Md. 446, 450, 50 A. 2d 560, 563 (1947); *Lewis v. Gsell*, 183 Md. 123, 128, 36 A. 2d 702, 704 (1944).

In *City of Baltimore v. Clerk of the Superior Court*, 270 Md. 316, 311 A. 2d 261 (1973), Judge Digges, writing for the Court, stated:

"It is well settled in this State that when two acts of the General Assembly covering similar subject

matter make no reference to each other, if it is at all feasible, they will be construed so as to give as full an effect to each other as possible. *Prince George's Co. v. McBride,* 263 Md. 235, 240-41, 282 A. 2d 486, 489 (1971). In order for one statute to alter or limit another, the intention of the Legislature to do' so must be clear and manifest; otherwise, the requirements of one will be construed as embodying the provisions of the other. In such a situation, the second statute will not be considered as a substitute for the first regardless of the order in which they were enacted. *Welsh v. Kuntz,* 196 Md. 86, 97, 75 A. 2d 343, 347 (1950); *Pressman v. Elgin,* 187 Md. 446, 450, 50 A. 2d 560, 563 (1947)." 270 Md. at 319-20, 311 A. 2d at 263.

*See also Prince George's County v. White,* 275 Md. 314, 319, 340 A. 2d 236, 240 (1975); *Plaza Corp. v. Alban Tractor Co., Inc.,* 219 Md. 570, 589, 151 A. 2d 170, 180 (1959).

Where two statutory provisions are neither irreconcilable nor mutually repugnant, they should be construed in harmony with their respective objects and tenor. *Smith v. Gray Concrete Pipe Co., Inc.,* 267 Md. 149, 155, 297 A. 2d 721, 725 (1972); *Kirkwood v. Provident Savings Bank, supra; Public Service Commission v. Maryland Bay Co.,* 176 Md. 59, 73, 3 A. 2d 736, 742 (1939); *Loker v. State,* 2 Md. App. 1, 9, 233 A. 2d 342, 348 (1967), *aff'd,* 250 Md. 677, 245 A. 2d 814 (1968), *cert. denied,* 393 U. S. 1082 (1969). This principle is applicable even though the statutes were passed at different times and contain no reference to each other. *Board of Fire Commissioners of Balto. v. Potter,* 268 Md. 285, 290-91, 300 A. 2d 680, 683 (1973); *May v. Warnick,* 227 Md. 77, 83, 175 A. 2d 413, 415-16 (1961).

Similarly controlling is the premise that "[w]here there is a specific enactment and a general enactment 'which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the

provisions of the particular enactment.' " *Criminal Injuries Comp. Board v. Gould,* 273 Md. 486, 495, 331 A. 2d 55, 61 (1975); *Henry v. State,* 273 Md. 131, 134 n. 1, 328 A. 2d 293, 296 n.1 (1974); *Maguire v. State,* 192 Md. 615, 623, 65 A. 2d 299, 302 (1949). *See also* 73 Am. Jur. 2d *Statutes* § 416 (1974); 82 C.J.S. *Statutes* § 369 (1953).

When the Provincial General Assembly, in 1704, enacted Ch. 92, it pointed out that "no Rule yet made [established] how far the Jurisdiction of each County [divided by navigable Rivers] shall extend on the River;" that statute was directed specifically at fixing the boundary of counties separated by navigable *rivers.* When, 204 years later, the General Assembly enacted Ch. 487 of the Acts of 1908, this subsequent enactment pertained generally to "the jurisdiction of every county bounded *at any point* by navigable *waters"* (emphasis added); no reference whatsoever was made therein to Ch. 92 of the Act of 1704. Although concededly the term "rivers" would be embraced within the generic term "waters," in its most comprehensive sense, in our view the provisions of Ch. 92, of the Act of 1704, as codified in Art. 75, § 81, must be considered as the operative specification for fixing the boundary between counties divided by navigable *rivers.* Chapter 487, of the Acts of 1908, as codified in Art. 75, §§ 82-84, providing for the fixing of jurisdiction of counties "bounded at any point by navigable waters," as a general enactment, must be held to affect "only such cases within its general language as are not within the provisions" of Art. 75, § 81. Thus, inapplicable to the fixing of boundaries between counties upon navigable *rivers,* § 82 pertains otherwise to establishing the jurisdictional limits of counties, bounding at any point upon navigable *waters* — such as upon the waters of the Chesapeake Bay.

When Ch. 487 of the Acts of 1908 was enacted, there was neither a reference to Ch. 92 of the Act of 1704, nor any suggestion in the title or preamble of the latter statute of any intention to repeal the earlier Act, or that it was to become a substitute for the statute enacted two centuries earlier. We find no irreconcilability or repugnancy in the

provisions of the two enactments; in our view the two statutes relating respectively to the jurisdiction of counties on navigable *rivers* which separate them, and to the jurisdiction of counties which are bounded *at any point* on navigable *waters*, can be construed together, so that they will harmonize with each other and be consistent with their respective objects and tenor. We conclude that Art. 75, § 81, as we construe it, is controlling in fixing the boundary between two counties upon a navigable *river*, at the middle of the channel of that river, except where a dividing line has been otherwise fixed by law. We construe the provisions of Art. 75, § 82, pertaining to the extension of the jurisdiction of counties, bounded *at any point* on navigable *waters*, and fixing such a boundary at "the center of said waters," to be here inapplicable where the boundary between the counties is a navigable river.

We thus hold that under the provisions of Art. 75, § 81, as we have construed the term "channel," and by virtue of Article XIII, § 2 of the Constitution, the boundary between Wicomico and Somerset Counties is the thalweg, or middle of the channel of the Wicomico River, and continues on that line to the point where that channel, in Tangier Sound, intersects the middle of the main channel of the Nanticoke River.

The location of the navigable channel of the Wicomico River, in the area under dispute, was identified on hydrographic maps prepared by the United States Coast and Geodetic Survey, and its predecessors, which were offered in evidence in the trial court. These hydrographic maps dated 1857, 1901-02 and 1973, established that in the area under dispute, the natural channel of the Wicomico River had not changed significantly in 116 years. A transparency of the channel, shown on the 1857 chart, when superimposed upon the 1973 chart, demonstrated that the channel had not shifted since 1857. The boundary line between the two counties, as depicted on the hydrographic charts of the Oyster Survey of 1906 to 1912, and its amendments, including a chart prepared in 1961, followed the natural channel of the Wicomico River, and showed that the Great

Shoals and the Middleground Oyster Bars are on the Wicomico County side of the channel of the Wicomico River.

There was testimony in the trial court from a waterman who had harvested oysters in the waters of the Wicomico River for over 70 years, that historically, he, and his peers, had considered the areas where these oyster bars were located, to be within the boundary of Wicomico County. There was additional evidence that for a period of 20 to 30 years, the Department of Natural Resources, for the purpose of the planting and seeding of oysters, had considered the disputed area to be within Wicomico County.

On the other hand, the topographic maps, prepared by the Maryland Geological Survey, which were admitted into evidence pursuant to Art. 75, § 83, portrayed only the geographic features of the counties lying landward of the highwater mark of the River. Such maps do not depict channels, shoals, or other underwater geographic features, as do hydrographic charts. No hydrographic data is used in their preparation, except a delineation of the shoreline, and occasionally the location of a large permanent structure, located within the water, such as a lighthouse, which has geographic significance.

It must here be observed that the Great Shoals lighthouse, established as a "triangulation point" by the United States Coast and Geodetic Survey, in 1901, is recorded among the records of the United States Department of Commerce to be located "in Wicomico County," and that hydrographic charts prepared by the United States Coast and Geodetic survey, showing the lighthouse to be north of the channel of the Wicomico River, also locate it within Wicomico County. On the other hand, the topographical maps prepared by the Maryland Geological Survey, which originate from a 1903 United States Geological Survey map, place the lighthouse, located upon the Great Shoals, and northward of the channel of the Wicomico River, to be south of the mid-river line and thus in Somerset County.

Similarly, the topographic maps, undertaking to lay out the boundary between the counties, do not follow the

channel of the river, but depict it as passing in the geographic mid-point of the river, a significant distance north of the channel, with the result that a portion of both the Great Shoals and Middleground Oyster Bars geographically are located southward of the mid-line of the river.

We think it was error for the trial court to have used the topographical maps, prepared pursuant to Ch. 51 of the Laws of Maryland, 1896, and Ch. 129 of the Laws of Maryland, 1898, in determining the boundary between the two counties; that court should have relied upon the hydrographic charts of the Oyster Survey of 1906 to 1912, and its amendments, depicting as they do, the channel of the Wicomico River, as the boundary between the two counties, for the purpose of determining venue.

For the foregoing reasons, we conclude that the second paragraph of the trial court's Order of December 23, 1974, as modified by the Court of Special Appeals, must be vacated; and in substitution therefor, that paragraph shall read: "The proper boundary between Wicomico and Somerset Counties, for the purposes of venue, is as shown on the charts of the Oyster Survey of 1906 to 1912, and its amendments, depicting the channel of the Wicomico River."

*Judgment of the Court of Special Appeals reversed; case remanded to that court with directions that the case be remanded to the Circuit Court for Wicomico County for the passage of an order, in accordance with the order set forth above; costs to be paid by appellant.*

*Smith, J., dissenting:*

I dissent for all of the reasons so lucidly and thoughtfully expressed by Judge Melvin for the Court of Special Appeals

in *Dep't of Nat. Resources v. France,* 28 Md. App. 110, 344 A. 2d 193 (1975), including his conclusions:

1 - That the primary meaning of the word "channel" as set forth in Black's Law Dictionary (Rev. 4th ed. 1968) and Webster's Third New International Dictionary (1967) is "[t]he bed in which the main stream of a river flows, rather than the deep water of the stream as followed in navigation" and "[t]he hollow bed where a natural body or stream of water runs or may run," respectively.[1]

2 - That the term "channel" "[a]s a precise boundary line between counties . . . is all but illusory and fosters uncertainty where certainty should exist."

3 - That it is "more likely that the framers of the 1867 Constitution used the word channel in its primary sense as meaning the great body of water between the banks of the river, and that, by analogy to the common law rule pertaining to

---

1. I have found no dictionary giving a primary meaning to the word "channel" disagreeing with that above. *E.g.,* Webster's New International Dictionary (2d ed. unabridged 1959) is identical with that cited from Webster above. Other authorities give the primary meaning as: The Compact Edition of the Oxford English Dictionary (1971), "The hollow bed of running waters . . ."; Webster's New World Dictionary of the American Language (college ed. 1953), "The bed of a running stream, river, etc."; The Concise Oxford Dictionary (5th ed. 1964), "Natural or artificial bed of running water"; The Penguin Dictionary of English (1964), "river bed"; and The American College Dictionary (1964), "the bed of a stream or waterway." Moreover, 14 C.J.S. *Channel* (1939) states:

"It has been said that the word is a generic term applicable to any watercourse, whether a river, creek, slough, or canal; and that its precise meaning depends upon the context in which it is used, two lines of definitions being generally recognized, the one, employed in boatmen's parlance, as meaning the course where the water is deepest and the navigation safest; *the other, in geographical usage,* designating the depression of a bed, below permanent banks, wherein waters flow and which may be sometimes full and sometimes not." (Emphasis added.) *Id.* at 397.

It certainly is in "geographical usage," not in "boatmen's parlance," that the term is used in defining the boundaries of a county, whether that definition be in the Constitution or in a statute.

non-tidal stream boundaries, the intended boundary was a line running along the middle of the river."

4 - That "it is immaterial which of the two Acts [(Chapter 92 of the Acts of 1704 or Chapter 487 of the Acts of 1908)] applies to the instant case, for in our opinion a proper interpretation of each reaches the same result: The jurisdiction of each county extends to the middle of the river, regardless of the location of the deep-channel line."

5 - That there is no inconsistency between this view and the boundaries of Wicomico County as set forth in Maryland Constitution Art. XIII, § 2 specifying the boundaries of that county.

The majority opinion is based upon the premise:

"that such considerations as 'the preservation by each [of the bounding jurisdictions] of its equal right in the navigation of a stream' and the preservation of the 'free navigation of the river' were of primary importance in the Province in 1704, when the 11 existing counties, all upon tidewater, were bounded by navigable rivers and were economically dependent on those rivers as 'highways of water' for their economic survival. It thus seems clear that it was the intent of the General Assembly, by the express use of the term 'channel,' when it enacted Ch. 92 of the Acts of 1704, to extend, and to insure, the jurisdiction of every county, bounding on a navigable river, to the thalweg, or the middle of the main navigable channel of every such river which constituted a boundary between counties.

"The General Assembly patently did not intend that the navigable channel in such a river should lie wholly within the jurisdiction of one or the other of the counties on opposite shores — a result which could conceivably occur — should such boundary be fixed at the geographic mid-point between the

banks of such a river. It appears to have been in recognition of such mutual jurisdictional rights by the bounding counties, in the use of the channel of such a river, that the Act of 1704 provided for the service of process, by the officers of either of such bounding counties, upon a vessel 'rid[ing] at Anchor in the Channel of such River.' "

Such a premise equates counties with sovereign nations or with other states of the United States. All of the reading I have been able to do on the subject indicates that our counties and their powers were based upon the system prevailing in England at the time of the first settlements. None of the authorities I have reviewed show any legislative power in a county prior to 1776. From the adoption of our Constitution of that year until the advent of "home rule," a comparatively new doctrine in Maryland, counties never had legislative powers. Wicomico County has had "home rule" only since 1964. Somerset County has never had it.

Prior to the passage of Chapter 129 of the Acts of 1862, about which I shall have more to say, "it had been held that the Lord Proprietary became vested under the Charter of Maryland with title to the soil under navigable waters, that he could convey title thereto and that the State succeeded to these rights. *Browne v. Kennedy,* 5 Harris & J. 195 [(1821)]." *Wagner v. City of Baltimore,* 210 Md. 615, 622, 124 A. 2d 815 (1956). Accretions to land on navigable waters did not become the property of the abutting land owners. Consequently, patents are to be found among the patent records of this State issued to property owners on rivers of the State covering accretions to their land. What was Code (1957) Art. 54, § 45, prior to its repeal by Chapter 241 of the Acts of 1970, provided under the 1862 enactment that "[t]he proprietor of land bounding on any of the navigable waters of this State sh[ould] be entitled to all accretions to said land . . . ." In that circumstance, with Maryland as sparsely settled as it was in 1704 and all authority concentrated in the Lord Proprietor or the Royal Governor (depending upon

just what year is involved) and the Provincial General Assembly, of what possible concern to a county was the precise location of its boundary line? Of one thing we may be sure, that is that the county as such was without power to interfere with navigation.

I find it much more reasonable to believe that Chapter 487 of the Acts of 1908 was enacted in response to the decision of this Court in *Western Maryland Tidewater Railroad Company v. Baltimore City*, 106 Md. 561, 68 A. 6 (1907) (actually decided November 13, 1907), than in response to the decision in *Taylor v. State*, 79 Md. 130, 28 A. 815 (1894), 14 years before the passage of that act. I do not believe the position I take here is to the slightest degree inconsistent with the opinion of Chief Judge Horney in *State v. Thomas*, No. 50, Criminal Trials, (1957) in the Circuit Court for Queen Anne's County.

I note that the majority apparently is of the view that the term "navigable waters" as used in the 1908 act does not include the term "navigable river" as used in the 1704 act. "Navigable waters" is defined in Black's Law Dictionary (Rev. 4th ed. 1968) as "[t]hose waters which afford a channel for useful commerce." *Wagner* is clear authority for the proposition that in this State the test for determining navigability is "whether or not the waters in question are tidal . . . ." 210 Md. at 624. The position of the majority that the term "navigable waters" does not embrace a "navigable river" is inconsistent with many of the prior holdings of this Court. *See, e.g., Van Ruymbeke v. Patapsco Ind. Park*, 261 Md. 470, 475, 276 A. 2d 61 (1971); *Owen v. Hubbard*, 260 Md. 146, 152-53, 271 A. 2d 672 (1970); and *Wagner v. City of Baltimore, supra*. In *Wagner* the Court had before it the proper interpretation to be given to Chapter 129 of the Acts of 1862 which was concerned with the rights of "proprietor[s] of land bounding on any of the *navigable waters* of this State," (Emphasis added.) providing, among other things, for such proprietors "to be entitled to the exclusive right of making improvements into the waters in front of [their] said land," and that "no patent sh[ould]

[t]hereafter issue for land covered by *navigable waters.*" (Emphasis added.) The controversy there involved neither the Chesapeake Bay nor the Atlantic Ocean, but the Patapsco River. Chief Judge Brune there said for the Court:

> "Where a stretch of river is navigable lengthwise, we think that all of the waters between the opposite shores or banks are comprehended within the term 'navigable waters' as used in Chapter 129 of the Acts of 1862." *Id.* at 626.

Thus, it would seem to me that any river which is navigable would fall within the term "navigable waters" as expressed in the 1908 act.

In 1908 the session laws do not seem to have been put together in the same manner as they are today with chapters following in numerical order. Chapter 487 was placed under the heading "Art. 75.] Pleadings, Practice and Process at Law." Also passed in that year by Chapter 408 and placed under the heading of "Art. 27.] Crimes and Punishments." was a new section, designated § 433 A, now Code (1957) Art. 27, § 590, providing that a "person who may commit any crimes . . . on or at the boundary or divisional line between any of the counties in this State, or so near thereto or where the exact location of such boundary is so uncertain as to render it doubtful in which county the offense was committed, then the county which first assumes jurisdiction by issuing process for the arrest and prosecution of the offender shall have jurisdiction to charge, present, indict, try, convict and sentence; and in such case it shall be only necessary for the State to establish the venue alleged in the information, warrant or indictment, by proving that the offense was at or on the boundary of the county wherein the accused is being tried, or was so near thereto or the location of the boundary is so uncertain as to render it doubtful in which county the crime was committed."

I think Chapter 487 was enacted for the purpose of provid-

ing a common sense method of determining county lines for the purposes of litigation without the necessity of a complicated survey and the production of expert witnesses. Likewise, Chapter 408 was intended to provide a common sense method for prosecution where the exact situs of a crime in relation to a county boundary was uncertain.